2017 PA Super 88

| | |
|---|---|
| KELLY BRANTON; SHAWN BRANTON; MITCHELL BRANTON, A MINOR, BY KELLY BRANTON AND SHAWN BRANTON, GUARDIANS; LILLY BRANTON, A MINOR, BY KELLY BRANTON AND SHAWN BRANTON, GUARDIANS; BECK BRANTON, A MINOR, BY SHAWN BRANTON, GUARDIAN; PAT COURTWRIGHT; PHILIP COURTWRIGHT; GARY E. JOHNSON; GEORGINA B. JOHNSON; CAROL KLINE; RICHARD LONG; ANN MCKEAN; THOMAS J. MCKEAN; DEBORAH A. MUTHLER; STEPHEN K. MUTHLER; STEPHEN P. RICE; SUSAN RICE; AND KIM SHIPMAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| NICHOLAS MEAT, LLC; BRETT BOWES D/B/A BOWES FARM; CAMERER FARMS, INC.; AND JAB LIVESTOCK, LLC., | |
| Appellees | No. 536 MDA 2016 |

Appeal from the Judgment Entered March 4, 2016
In the Court of Common Pleas of Lycoming County
Civil Division at No(s): 13-01502

BEFORE:   BOWES, OLSON and STABILE, JJ.

OPINION BY OLSON, J.                              **FILED APRIL 04, 2017**

Appellants, Kelly Branton *et al*, appeal from the judgment entered on

March 4, 2016 in favor of Nicholas Meat, LLC ("Nicholas"), Brett Bowes d/b/a

Bowes Farm, Camerer Farms, Inc. ("Camerer Farm" and together with

Nicholas and Bowes Farm "Farmers"), and JAB Livestock, LLC ("JAB").[1] After careful consideration, we hold that Appellants' action is partially barred by the Right to Farm Act ("RTFA"), 3 P.S. §§ 951-957. Accordingly, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

The factual background and procedural history of this case are as follows. Nicholas operates a slaughterhouse in Loganton, Pennsylvania. The slaughterhouse generates food processing waste ("FPW"),[2] which is rich in nutrients essential to farming. Beginning in 2011, Nicholas began transporting FPW from the slaughterhouse to the Bowes and Camerer Farms. The FPW is immediately spread on the Bowes and Camerer Farms and/or stored in a 2,400,000 gallon tank on the Bowes Farm ("the storage tank").

---

[1] JAB's involvement in the legal issues we address herein is minimal. It is only responsible for transporting food processing waste.

[2] FPW is defined as:

> Residual materials in liquid and solid form generated in the slaughtering of poultry and livestock, or in processing and converting fish, seafood, milk, meat[,] and eggs to food products. The term includes residual materials generated in the processing, converting[,] or manufacturing of fruits, vegetables, crops[,] and other commodities into marketable food items. The term also includes vegetative residuals from food processing activities that are usually recognizable as part of a plant or vegetable, including cabbage leaves, bean snips, onion skins, apple pomace[,] and grape pomace.

25 Pa. Code § 287.1.

The FPW stored on the Bowes Farm is later spread on the Bowes and Camerer Farms.

On March 17, 2011, the Pennsylvania Department of Environmental Protection ("DEP") issued Camerer Farm a notice of violation ("NOV").[3] Appellants' Brief in Opposition to Motion for Summary Judgment, 1/19/16, at Exhibit 3. That NOV stated that Camerer Farm violated 35 P.S. §§ 6018.302(a) and 6018.610(1) by spreading FPW between February 25 and 27, 2011. DEP informed Camerer Farm that it needed a nutrient management plan[4] or needed a permit for spreading FPW on its land. The following day, March 18, 2011, DEP issued a NOV to Nicholas for permitting its FPW to be spread on Camerer Farm between February 25 and 27, 2011. Appellants' Brief in Opposition to Motion for Summary Judgment, 1/19/16, at Exhibit 4. That NOV stated that Nicholas violated 25 Pa. Code § 291.201(a) in allowing its FPW to be spread on Camerer Farm.

On April 15, 2013, DEP issued a NOV to Nicholas for providing FPW which was spread on Bowes Farm in late March and/or early April 2013.

_____

[3] All of the NOV's issued by DEP were the result of complaint inspections. In other words, the only reason DEP investigated Farmers was because a subset of Appellants complained to DEP. As discussed more fully *infra*, the reasons for DEP's site visits to Farmers' facilities explains, in part, why we conclude that Appellants' construction of the term "lawfully" in 3 P.S. § 954(a) violates several principals of statutory construction.

[4] A nutrient management plan is defined, in relevant part, as "[a] written site-specific plan which incorporates best management practices to manage the use of plant nutrients for crop production and water quality protection[.]" 3 P.S. § 503.

*See* Appellants' Brief in Opposition to Motion for Summary Judgment, 1/19/16, at Exhibit 5. That NOV stated that Nicholas violated 35 P.S. § 6018.610(9) and 25 Pa. Code § 287.101(b)(2) by permitting its FPW to be spread within 150 feet of a stream and in an area not covered by a nutrient management plan. That same day, April 15, 2013, DEP issued a NOV to Bowes Farm for spreading FPW in late March and/or early April 2013. *See* Appellants' Brief in Opposition to Motion for Summary Judgment, 1/19/16, at Exhibit 6. That NOV stated that spreading FPW within 150 feet of a stream and in an area not covered by a nutrient management plan violated section 287.101(b)(2).

On June 14, 2013, Appellants filed a complaint which alleged negligence and a temporary private nuisance.[5] Less than one month later, DEP issued a NOV to Bowes Farm for spreading FPW on June 25, 2013. Appellants' Brief in Opposition to Motion for Summary Judgment, 1/19/16, at Exhibit 7. That NOV stated that Bowes Farm violated section 287.101(b)(2) by spreading FPW during summer when the relevant nutrient management plan stated that FPW would not be spread during summer.

On November 15, 2013, Appellants filed their second amended complaint. On December 18, 2015, Farmers moved for summary

_____

[5] Appellants later withdrew the negligence portion of their complaint.

judgment.[6] As part of their summary judgment motion, Farmers argued that Appellants' claims were barred by RTFA's statute of repose. On March 4, 2016, the trial court granted Farmers' summary judgment motion. Contemporaneously therewith, the trial court issued an opinion outlining its rationale for granting summary judgment. ***Branton v. Nicholas Meat, LLC***, 2016 WL 1270378 (C.C.P. Lycoming Mar. 4, 2016). This timely appeal followed.[7]

Appellants present three issues for our review:

1. Did the [t]rial [c]ourt err as a matter of law in holding on [s]ummary [j]udgment that [Appellants'] claims were barred by [RTFA] despite the evidence presented by [Appellants] that [Farmers'] practice of spreading [FPW] was unlawful and in violation of various regulations, codes[,] and statutes?

2. Did the [t]rial [c]ourt err as a matter of law in rejecting [Appellants'] claim that [Farmers'] practice of spreading [FPW] was not a "normal agricultural operation" under the RTFA?

3. Did the [t]rial [c]ourt err as a matter of law in holding on [s]ummary [j]udgment that [Appellants'] claims were barred by RTFA despite the evidence presented by [Appellants] that the addition of a[n FPW] waste storage tank on the Bowes Farm in April 2012 was a substantial change under the RTFA?

---

[6] JAB filed a separate motion which joined in Farmers' motion for summary judgment.

[7] On April 5, 2016, the trial court ordered Appellants to file a concise statement of errors complained of on appeal ("concise statement"). ***See*** Pa.R.A.P. 1925(b). On April 26, 2016, Appellants filed their concise statement. On May 11, 2016, the trial court issued an order which stated that the reasons it granted summary judgment appeared as of record in its March 4, 2016 opinion. ***See*** Pa.R.A.P. 1925(a). All issues raised on appeal were included in Appellants' concise statement.

Appellants' Brief at 7.

All three of Appellants' issues challenge the trial court's determination that RTFA bars their action against Farmers and JAB. "The trial court's entry of summary judgment presents a question of law, and therefore our standard of review is *de novo* and our scope of review is plenary." ***Fisher v. A.O. Smith Harvestore Products, Inc.***, 145 A.3d 738, 741 (Pa. Super. 2016) (*en banc*) (citation omitted).

RTFA provides, in relevant part, that:

> No nuisance action shall be brought against an agricultural operation which has lawfully been in operation for one year or more prior to the date of bringing such action, where the conditions or circumstances complained of as constituting the basis for the nuisance action have existed substantially unchanged since the established date of operation and are normal agricultural operations, or if the physical facilities of such agricultural operations are substantially expanded or substantially altered and the expanded or substantially altered facility has either: (1) been in operation for one year or more prior to the date of bringing such action, or (2) been addressed in a nutrient management plan approved prior to the commencement of such expanded or altered operation pursuant to [3 Pa.C.S.A. § 506], and is otherwise in compliance therewith[.]

3 P.S. § 954(a). Section 954(a) is a statute of repose and not a statute of limitations.[8] ***Gilbert v. Synagro Cent., LLC***, 131 A.3d 1, 15 (Pa. 2015).

---

[8] As this Court has explained:

> A statute of repose, as opposed to a statute of limitations, is a statute barring any suit that is brought after a specified time since the defendant acted even if this period ends before the

*(Footnote Continued Next Page)*

There are three key requirements for section 954(a) to bar a nuisance action: (1) the agricultural operation against which the action is brought must have lawfully operated for at least a year prior to the filing of the complaint; (2) (a) the conditions or circumstances that are the basis for the complaint must have existed substantially unchanged since the established date of operation, or (b) if physical facilities have been substantially expanded or altered such facilities must have (i) operated for at least one year prior to the filing of the complaint or (ii) been addressed in a nutrient management plan approved prior to the commencement of such expanded or altered operation; and (3) the conditions or circumstances are normal agricultural operations.[9] **See** 3 P.S. § 954(a).

*(Footnote Continued)* ————————————

plaintiff has suffered a resulting injury. Another distinguishing characteristic is the corresponding legal effect of each statute. Statutes of limitations are a form of procedural law that bar recovery on an otherwise viable cause of action. Conversely, statutes of repose operate as substantive law by extinguishing a cause of action outright and precluding its revival.

**Graver v. Foster Wheeler Corp.**, 96 A.3d 383, 386–387 (Pa. Super. 2014), *appeal denied*, 113 A.3d 280 (Pa. 2015) (ellipsis, internal alteration, quotation marks, footnote, and paragraph break omitted); **see also CTS Corp. v. Waldburger**, 134 S.Ct. 2175, 2182–2184 (2014). Thus, "[w]hile a statute of limitations merely bars a party's right to a remedy, a statute of repose completely abolishes and eliminates a party's cause of action." **Gilbert v. Synagro Cent., LLC**, 131 A.3d 1, 15 (Pa. 2015) (citation omitted).

[9] In **Gilbert**, our Supreme Court recited a simplified version of these requirements. **See Gilbert**, 131 A.3d at 19 (citation omitted). This case, however, requires us to apply requirements that were not implicated in

*(Footnote Continued Next Page)*

We begin our analysis by examining what standard governed the trial court's consideration of Farmers' summary judgment motion. Appellants argue that the trial court was required to apply the general summary judgment standard. According to Appellants, summary judgment was only appropriate if "the record clearly demonstrates that there [were] no genuine issue of material fact[.]" *Telwell Inc. v. Grandbridge Real Estate Capital, LLC*, 143 A.3d 421, 425 (Pa. Super. 2016) (citation omitted). According to Appellants, the trial court (and this Court) "must view the record in the light most favorable to [Appellants], resolving all doubts as to the existence of a genuine issue of material fact against [Farmers]." *Id.* (citation omitted).[10] Farmers, on the other hand, argue that the applicability of the statute of repose was a purely legal question for the trial court to decide. *See Smith v. Workmen's Comp. Appeal Bd. (Concept Planners & Designers)*, 670 A.2d 1146, 1148-1149 (Pa. 1996). Thus, according to Farmers, there was no genuine issue of material fact relating to the applicability of the statute of repose.

*(Footnote Continued)* ─────────────

*Gilbert*. Therefore, we list all of the requirements set forth in section 954(a).

[10] The thrust of Appellants' argument that fact finding precludes the entry of summary judgment on their claims is that various inquiries must be resolved before deciding whether certain activities or objects fall within the statutory definitions drawn by section 954(a) of the RTFA. Such inquiries, as our Supreme Court held and as we shall explain, involve application of statutory definitions to record facts and, hence, constitute matters of statutory construction.

We agree with Farmers that the applicability of the statue of repose in this case was a purely legal question that the trial court could decide on a motion for summary judgment. In **Gilbert**, our Supreme Court explained that

> generally, statutes of repose are jurisdictional and their scope is a question of law for courts to determine. . . . [T]here may be cases in which a statute of repose's applicability turns on resolution of factual issues. In such cases, the facts relevant to jurisdiction are so intertwined with those relating to the merits of the action, the jurisdictional determination will necessarily involve fact finding.

**Gilbert**, 131 A.3d at 15 (internal citations omitted).

In **Gilbert**, the appellees were individuals who owned or resided on properties adjacent to a farm known as Hilltop Farms. Biosolids were spread on 14 fields of Hilltop Farms. The appellees alleged that extremely offensive odors emanated from the spread biosolids. The appellees sued various entities and individuals, including the owner of Hilltop Farms, claiming private nuisance, negligence, and trespass. Appellants moved for summary judgment on the basis that the appellees' nuisance claim was barred by the one-year statute of repose in section 954(a) of the RTFA. In finding that the RTFA statute of repose barred the appellees' nuisance claim, our Supreme Court held as follows:

> the only question was whether the application of biosolids is a "normal agricultural operation;" there was no pertinent question regarding the character of the substance in this specific case or appellants' use of it at Hilltop Farms.

\* \* \*

[T]he necessary facts are undisputed and of record. These facts include the timing and quantity of appellants' application of biosolids, the responsive actions by appellees and the timing of those actions, the regulatory oversight of appellants' biosolids application, and the history and extent of biosolids usage in Pennsylvania's farming industry. . . . [N]either party's conduct is unknown or in dispute. Rather, the only question is whether appellants meet the statutory requirements necessary to avail themselves of the RTFA's statute of repose. This question does not involve fact finding; it involves the application of a statute's definition to the record's facts. It is well settled that determining whether an activity, entity, or object falls within the meaning of a statutory definition is a matter of statutory interpretation, and thus is a question of law for the court to decide. Accordingly, the determination of whether [section] 954(a) applied in the instant matter was a question of law for the trial court.

* * *

Th[e General Assembly's intent in passing RTFA] cannot be achieved by permitting the applicability of the RTFA's statute of repose to be dependent on an idiosyncratic determination of a farming practice's "normality" as perceived by a jury in a specific case. . . . [T]he inquiry under [section] 954(a)—whether an activity is a "normal agricultural operation"—is a categorical inquiry for the court. Otherwise, agricultural practices would be subject to nuisance suits based on varying local perceptions of what constitutes a "normal agricultural operation," as parochial opinion differs from jury to jury and juror to juror. What is common in one area may be foreign to another. Having courts apply the RTFA's definitions achieves the meaningful degree of legal certainty, uniformity, and consistency that the RTFA was intended to provide to farms.

*Gilbert*, 131 A.3d at 16-18 (internal citations, footnote, and certain paragraph breaks omitted).

All three of the issues raised by Appellants in this case similarly deal with pure questions of law. In their first issue, Appellants argue that Farmers' activities were unlawful. There is no dispute about what the

relevant federal, state, and local laws were during the applicable time period nor is there any dispute about the factual activities surrounding Farmers' use and storage of FPW. Instead, the only dispute is whether those activities violated various federal, state, or local laws and, if so, whether such non-compliance resulted in Farmers' activities being unlawful. Whether a practice violates federal, state, or local law is a pure question of law which the trial court could decide on summary judgment. Similarly, whether a violation of federal, state, or local law rendered Farmers' agricultural operations unlawful is a pure question of law which the trial court could decide on summary judgment.

In their second issue, Appellants argue that spreading FPW is not a normal agricultural operation. As in **Gilbert**, there is "no pertinent question regarding the character of the substance in this specific case or [Farmers'] use of it at [the Bowes and Camerer Farms]." **Gilbert**, 131 A.3d at 16. Thus, just as our Supreme Court held that whether biosolid use is a normal agricultural operation was a pure question of law in **Gilbert**, we hold that whether the spreading and storage of FPW is a normal agricultural operation in this case is a question of law which the trial court could decide on summary judgment.

In their third issue, Appellants argue that the addition of a storage tank on the Bowes Farm constituted a substantial change under the RTFA. Again, there is no factual dispute about the erection of the storage tank on

the Bowes Farm. Instead, the only question is whether the erection of the storage tank was a "substantial change" under section 954(a) that occurred within one year of the date on which Appellants filed their original complaint. This is a question of statutory interpretation. As such, it presents a pure question of law which the trial court could decide on summary judgment.

Having determined that all three of Appellants' issues raise pure questions of law (specifically questions of statutory interpretation) which the trial court properly decided on summary judgment, we turn to a *de novo* review of those determinations. "When interpreting a statute, this Court is guided by the Statutory Construction Act [] of 1972, 1 Pa.C.S.A. §§ 1501–1991." *CitiMortgage, Inc. v. Barbezat*, 131 A.3d 65, 73 (Pa. Super. 2016). "Our paramount interpretative task is to give effect to the intent of our General Assembly in enacting the particular legislation under review." *Egan v. Egan*, 125 A.3d 792, 795 (Pa. Super. 2015) (internal alteration and citation omitted). "[T]he best indication of the General Assembly's intent in enacting a statute may be found in its plain language[.]" *Watts v. Manheim Twp. Sch. Dist.*, 121 A.3d 964, 979 (Pa. 2015). We must construe words and phrases in statutes "according to rules of grammar and according to their common and approved usage[.]" 1 Pa.C.S.A. § 1903(a). "One way to ascertain the plain meaning and ordinary usage of terms is by reference to a dictionary definition." *In re Beyer*, 115 A.3d 835, 839 (Pa. 2015) (citation omitted).

When the plain language of a statue is ambiguous, we may consider, *inter alia*, the object to be obtained and the consequences of a particular interpretation. **See** 1 Pa.C.S.A. §§ 1921(c)(4) and 1921(c)(6). Moreover, when interpreting a statute we must presume "[t]hat the General Assembly [did] not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S.A. § 1922(1). We must also presume "[t]hat the General Assembly intends to favor the public interest as against any private interest." 1 Pa.C.S.A. § 1922(5).

In their first issue, Appellants argue that the trial court erred in determining that Farmers' agricultural operations were lawfully in operation since at least June 14, 2012, *i.e.*, one year prior to the filing of the instant lawsuit. Appellants aver that Farmers' operation were unlawful up until at least April 14, 2013, *i.e.*, two months prior to the filing of Appellants' complaint. Specifically, Appellants argue that the NOVs issued by DEP indicate Farmers' operations were unlawful. Moreover, Appellants argue that Farmers failed to properly control odors as required by various state regulations. Thus, according to Appellants, their lawsuit was filed prior to the date their cause of action was extinguished by RTFA's statute of repose. Farmers, on the other hand, contend that they have lawfully spread FPW since 2011, *i.e.*, more than one year prior to the filing of the instant action.

The relevant portion of section 954(a) states that, "No nuisance action shall be brought against an agricultural operation which has lawfully been in

operation for one year or more prior to the date of bringing such action[.]" 3 P.S. 954(a).[11] The phrase in dispute is "has lawfully been in operation." Specifically, Appellants argue that this phrase requires that the agricultural operation must not have violated a single federal, state, or local law during the relevant one-year time period. On the other hand, Farmers argue that section 954(a) only requires that an agricultural operation be in substantial compliance with relevant federal, state, and local laws.

RTFA does not define the term "lawfully." Appellants, therefore, correctly turn to the dictionary definition of the term in order to ascertain its plain meaning. Appellants' Brief at 24-25; *see Beyer*, 115 A.3d at 839. Black's Law Dictionary defines the term lawful as, "Legal; warranted or authorized by the law; having the qualifications prescribed by law; not contrary to nor forbidden by the law." *Black's Law Dictionary* 797 (5th ed.

---

[11] The Pennsylvania Farm Bureau, as *amicus curiae*, urges us to hold that this portion of section 954(a) refers to the farm itself and not the specific agricultural activity conducted on the farm. In **Gilbert**, the parties briefed this issue; however, our Supreme Court declined to decide it. **See Gilbert**, 131 A.3d at 15 n.17. As the parties have not fully briefed this issue and we conclude that, even assuming *arguendo* that the one-year time frame refers to the specific agricultural activity instead of the farm, Farmers operated lawfully for at least one year prior to the filing of Appellants' complaint, we decline to reach the issue raised by *amicus*. Nonetheless, we thank *amicus* for bringing to our attention other "relevant matter[s] not already brought to [our] attention by the parties[.]" Pa.R.A.P. 531 note (citation omitted).

1979).[12]  Appellants contend that, because Farmers were cited on three occasions[13] for spreading FPW, Farmers' actions were *ipso facto* not legal. Thus, according to Appellants, Farmers' agricultural operations were not lawfully in operation for at least one year prior to the filing of the instant action.

What Appellants fail to acknowledge is the note to the definition of the term lawful contained within Black's.  Specifically, the note to the term "lawful" states that:

> The principal distinction between the terms "lawful" and "legal" is that the former contemplates the substance of law, the latter the form of law.  To say of an act that it is "lawful" implies that it is authorized, sanctioned, or at any rate not forbidden, by law. To say that it is "legal" implies that it is done or performed in accordance with the forms and usages of law, or in a technical manner.  In this sense "illegal" approaches the meaning of "invalid."  For example, a contract or will, executed without the required formalities, might be said to be invalid or illegal, but could not be described as unlawful.  Further, the word "lawful" more clearly implies an ethical content than does "legal."  The latter goes no further than to denote compliance, with positive, technical, or formal rules; while the former usually imports a moral substance or ethical permissibility.  A further distinction is that the word "legal" is used as the synonym of "constructive," which "lawful" is not. . . . But there are some connections in which the two words are used as exact equivalents.

*Black's Law Dictionary* 797 (5th ed. 1979).

---

[12] Black's is now in its tenth edition; however, we use the fifth edition because it was the most current version at the time RTFA became law in 1982.

[13] Although DEP issued Farmers a total of five NOVs, twice DEP issued nearly identical NOVs to Nicholas and the farm on which FPW was spread.  Thus, for all practical purposes, DEP cited Farmers on three separate occasions.

Our Supreme Court recognized this distinction between the terms "lawful" and "legal" as far back as 1893. Specifically, our Supreme Court stated that "there is a clear differential distinction between the words 'legal' and 'lawful[.]'" ***McCandless v. Allegheny Bessemer Steel Co.***, 25 A. 579, 585 (Pa. 1893). In ***McCandless***, our Supreme Court held that the means used by the plaintiff (a sheriff) to protect the defendant (a company facing mob violence) were not legal; however, they were lawful. ***See id.***[14] As such, we hold that under the plain language of section 954(a), an agricultural operation must be in substantial compliance with applicable federal, state, and local laws at least one year prior to the filing of a complaint in order to satisfy the first requirement of section 954(a).[15]

This interpretation of the term "lawfully" in section 954(a) is consistent with this Court's decision in ***Horne v. Haladay***, 728 A.2d 954 (Pa. Super. 1999). In ***Horne***, as in the case *sub judice*, the plaintiff argued that the

---

[14] A simple illustration shows the distinction between "lawful" and "legal." If an individual who possess a valid driver's license is speeding, he is not legally operating the vehicle because he is driving over the posted speed limit. Nonetheless, he is lawfully operating the vehicle because he is licensed to do so.

[15] We reject Farmers' argument that section 954(b) of the RTFA requires a causal connection between the harm that is the subject of Appellants' complaint and the unlawful agricultural operation. Section 954(b) merely states that section 954(a) does not apply to actions brought for violation of federal, state, or local laws. ***See Gilbert v. Synagro Cent., LLC***, 90 A.3d 37, 42 (Pa. Super. 2014), *rev'd in part on other grounds*, 131 A.3d 1 (Pa. 2015). Section 954(b) does not, as Farmers contend, broaden the scope of section 954(a).

agricultural operation was not lawfully operated for at least one year prior to the filing of the nuisance action. This Court rejected that argument. Although there were no NOVs issued to the agricultural operation in **Horne**, unlike the NOVs issued in this case, this Court also relied upon the fact that "the record reveal[ed] that [the agricultural operation] made every effort to comply with applicable statutes and regulations[.]" **Id.** at 959. The clear implication of this statement is, even if NOVs had been issued by the relevant regulatory agency, that would not *ipso facto* mean the agricultural operation was unlawful. Instead, this Court implied, as we have held above, that technical violations of a federal, state, or local law does not strip an agricultural operation of protection under RTFA.

Moreover, even if we were to hold that the plain language of section 954(a) with respect to the term "lawfully" was ambiguous, we would reach the same conclusion. As noted above, when statutory language is ambiguous we may consider, *inter alia*, the object to be obtained and the consequences of a particular interpretation when ascertaining the General Assembly's intent. **See** 1 Pa.C.S.A. §§ 1921(c)(4) and 1921(c)(6). As our Supreme Court stated in **Gilbert**, the object to be obtained in RTFA is "reduc[ing] the loss to the Commonwealth of its agricultural resources by limiting the circumstances under which agricultural operations may be the subject matter of nuisance suits and ordinances." **Gilbert**, 131 A.3d at 17, *quoting* 3 P.S. § 951 (emphasis removed); **see Horne**, 728 A.2d at 957. If

**any** technical violation of **any** federal, state, or local law reset section 954(a)'s one-year time period, RTFA would not effectively limit the circumstances under which nuisance suits could be brought.[16]  This is because a collateral consequence of adopting Appellants' interpretation of the term "lawfully" would be to encourage individuals and companies to report minor violations to relevant authorities in an attempt to reset section 954(a)'s one-year time period.  As noted above, Appellants attempted to employ this tactic in the case *sub judice* by continually contacting DEP and complaining that Farmers were violating various state laws.

Furthermore, when interpreting a statute we must presume "[t]hat the General Assembly [did] not intend a result that is absurd, impossible of execution or unreasonable."  1 Pa.C.S.A. § 1922(1).  Resetting section 954(a)'s one-year time period every time a minor violation occurs is both absurd and unreasonable.  Even the most vigilant farmer in the Commonwealth may eventually violate a federal, state, or local law.  The adoption of section 954(a) demonstrates the intent of the General Assembly that farmers not be stripped of RTFA protection for an entire year because of a single violation.  We must also presume "[t]hat the General Assembly intends to favor the public interest as against any private interest."  1

---

[16] In their reply brief, Appellants argue that, because they lived on their land prior to Farmers spreading FPW, the purpose of RTFA would be advanced by permitting this action to proceed.  Appellants' Reply Brief at 35.  This is the exact argument that this Court rejected in **Horne**.  **Horne**, 728 A.2d at 957.

Pa.C.S.A. § 1922(5). Again, as stated in section 951, the public interest is in the promotion of agricultural activities within this Commonwealth. On the other hand, preventing malodors from emanating from a farm only promotes certain private interests. Thus, every tool of statutory interpretation indicates that Appellants' interpretation of the term "lawfully" is incorrect. Thus, even if the term "lawfully" were ambiguous, we would hold that an agricultural operation need only be substantially compliant with applicable federal, state, and local laws for at least one year prior to the filing of a complaint in order to satisfy the first requirement of section 954(a)'s statute of repose.

Having determined the meaning of the term "lawfully" in section 954(a), we turn to whether Farmers were in substantial compliance with applicable federal, state, and local laws for at least one year prior to the filing of the instant complaint. In this case, DEP *de facto* determined that Farmers substantially complied with applicable federal, state, and local laws for at least one year prior to the filing of the instant complaint. Specifically, on at least eight occasions between August 11, 2011 and the filing of the instant complaint on June 14, 2013, DEP stated there was no problem with Farmers' spreading of FPW. **See** Farmers' Motion for Summary Judgment, 12/18/15, at Exhibit M (August 16, 2011 DEP report stating that Nicholas' FPW could be spread on the Camerer and Bowes Farms); **id.** (February 22, 2012 DEP report stating that Nicholas' FPW was being spread in accordance

with all relevant laws and regulations); *id.* (January 29, 2013 letter from DEP to State Representative Garth D. Everett stating that the spreading of FPW on the Camerer and Bowes Farms was lawful); *id.* (February 14, 2013 DEP report stating that the technique the Farmers used to spread FPW was not unlawful); *id.* (April 27, 2013 DEP report finding no violations in the spreading of FPW on the Bowes and Camerer Farms); *id.* (April 29, 2013 internal DEP email stating that there were no problems with spreading of FPW by Farmers); *id.* (May 6, 2013 DEP report stating that Farmers were following proper procedures in spreading FPW); *id.* (May 8, 2013 DEP report stating that Farmers were not spreading FPW too close to a stream). As noted above, DEP issued all of the NOVs in this case. Nonetheless, DEP repeatedly found that Farmers were lawfully spreading FPW. The minor technical infractions by Farmers were promptly resolved and DEP took no further regulatory enforcement action, *i.e.*, DEP did not fine Farmers nor did it attempt to prohibit Farmers from spreading FPW on the Camerer and Bowes Farms.

Appellants also argue that Farmers failed to comply with, *inter alia*, sections 287.101(b)(2) and 291.201(a) by failing to control FPW odors on days not covered by the NOVs. In support thereof, Appellants rely upon their deposition testimony. This testimony, however, was contradicted by DEP, the agency responsible for enforcing 25 Pa. Code §§ 287.101(b)(2) and 291.201(a). As noted above, a subset of Appellants called DEP to complain

of malodors resulting from FPW dispersal. DEP enforcement officers responded to the scene of the alleged odors and "did not detect any malodors." Farmers' Motion for Summary Judgment, 12/18/15, at Exhibit M (February 22, 2011 DEP report); *see also id.* (November 22, 2011 DEP report stating "no strong odor" from spreading FPW). Appellants' arguments relating to 25 Pa. Code § 299.115 (storage) fail for the same reason. DEP inspected Bowes Farm several times after Farmers began storing FPW in the storage tank. *See e.g.*, Farmers' Motion for Summary Judgment, 12/18/15, at Exhibit M (DEP visited Bowes Farm on April 11, 2013 and found no violations); *id.* (DEP visited Bowes Farm on April 27, 2013 and found no violations); *id.* (DEP visited Bowes Farm on May 4, 2013 and found no violations). DEP never reported a violation of section 299.115 nor did DEP mandate that Famers make any changes in relation thereto. Thus, it is evident that Famers were in substantial compliance with sections 287.101(b)(2), 291.201(a), and 299.115 for at least one year prior to the commencement of the instant action. Accordingly, we conclude that Farmers lawfully spread FPW on the Bowes and Camerer Farms for at least one year prior to commencement of the instant action.

In their second issue, Appellants argue that the trial court erred in finding that spreading FPW is a normal agricultural operation. RTFA defines normal agricultural operation as:

> The activities, practices, equipment[,] and procedures that farmers adopt, use[,] or engage in the production and

preparation for market of poultry, livestock[,] and their products and in the production, harvesting[,] and preparation for market or use of agricultural, agronomic, horticultural, silvicultural[,] and aquacultural crops and commodities and is:

(1)    not less than ten contiguous acres in area; or

(2)    less than ten contiguous acres in area but has an anticipated yearly gross income of at least $10,000[.00].

The term includes new activities, practices, equipment[,] and procedures consistent with technological development within the agricultural industry. Use of equipment shall include machinery designed and used for agricultural operations, including, but not limited to, crop dryers, feed grinders, saw mills, hammer mills, refrigeration equipment, bins and related equipment used to store or prepare crops for marketing and those items of agricultural equipment and machinery defined by [3 P.S. § 1901 *et seq.*] Custom work shall be considered a normal farming practice.

3 P.S. § 952.

Farmers argue that this case is controlled by our Supreme Court's decision in **Gilbert**. We disagree. In **Gilbert**, our Supreme Court addressed whether the application of biosolids as fertilizer constituted a normal agricultural operation. **Gilbert**, 131 A.3d at 19-23. DEP defines biosolids as "[n]utrient-rich organic material produced from the stabilization of sewage sludge and residential septage that meet specific criteria and are suitable for land application." **See** goo.gl/s4ulbW (last accessed Feb. 3, 2017). When compared to DEP's definition of FPW, note 2 **supra**, it is evident that biosolids and FPW are distinct and a finding that application of biosolids is a normal agricultural operation does not *ipso facto* mean that application of FPW is a normal agricultural operation.

Nonetheless, we find our Supreme Court's discussion of whether the application of biosolids is a normal agricultural operation instructive in our analysis of whether spreading FPW is a normal agricultural operation. When determining if application of biosolids is a normal agricultural operation, our Supreme Court looked at "biosolids' history, related statutes and regulations, case law, and executive agencies' views[.]" **Gilbert**, 131 A.3d at 20. A careful examination of these same factors as they relate to spreading FPW indicates that spreading FPW is a normal agricultural operation.

We begin with the history of FPW in Pennsylvania. Both experts from Pennsylvania who submitted reports to the trial court stated that spreading FPW is a normal agricultural operation within this Commonwealth. The experts' reports include the fact that FPW has been spread on farmland in Pennsylvania for over 15 years. Moreover, DEP has issued permits to spread FPW to approximately three dozen locations across the Commonwealth. As implied above, however, DEP does not issue permits for the vast majority of the operations that spread FPW. Instead, when FPW is spread pursuant to a nutrient management plan there is no need to obtain a permit from DEP. Thus, FPW has a long history of use in agricultural operations within the Commonwealth and Pennsylvania industry experts consider spreading FPW to be a normal agricultural operation.

As to related statutes and regulations, our General Assembly has strongly implied that spreading FPW on farmland is a normal agricultural

operation. Specifically, the definition of "normal farming operations" states that, "It includes the management, collection, storage, transportation, use or disposal of . . . food processing waste . . . on land where such materials will improve the condition of the soil, the growth of crops, or in the restoration of the land for the same purposes." 35 P.S. § 6018.103. In other words, our General Assembly stated that normal farming operations include spreading FPW as fertilizer. It is inconceivable that our General Assembly meant for the spreading of FPW to be considered a normal **farming** operation but not a normal **agricultural** operation. To the contrary, the term "normal farming operation" is narrower than the term "normal agricultural operation." **Compare** 3 P.S. § 952 *with* 35 P.S. § 6018.103. The term "normal farming operation" closely mirrors the pre-1998 version of RTFA's definition of "normal agricultural operation." In 1998, the General Assembly amended RTFA to broaden the term "normal agricultural operation." **See** 1998 P.L. 441, 441-442; **see also Gilbert**, 131 A.3d at 20 (explaining the broadening of the term normal agricultural operation in the 1998 amendments to RTFA).

DEP, an executive agency involved in enforcement of the relevant regulations and statutes, believes spreading FPW is a normal agricultural operation. This is evidenced by the myriad regulations that DEP has promulgated relating to the dispersal of FPW. Appellants, in fact, rely upon many of these regulations when arguing that Farmers spread FPW unlawfully. **See** Appellants' Brief at 27-34 (arguing that Farmers' spreading

of FPW failed to comply with 25 Pa. Code § 291.1 *et seq.*); *id.* at 35-44 (arguing that Farmers' spreading of FPW failed to comply with 25 Pa. Code § 287.1 *et seq.*). Moreover, DEP's Food Processing Residual Manual states FPW "can serve as both a soil conditioner and fertilizer. [FPW has] been recycled through [land application system] programs for decades." Appellants' Brief in Opposition to Motion for Summary Judgment, 1/19/16, at Exhibit 12.

As our Supreme Court has explained, "an interpretation of a statute by those charged with its administration and enforcement is entitled to deference, such consideration most appropriately pertains to circumstances in which the provision is not explicit or is ambiguous." *Ins. Fed'n of Pennsylvania, Inc. v. Commonwealth of Pennsylvania Ins. Dep't*, 970 A.2d 1108, 1114 (Pa. 2009) (citation omitted). Therefore, we conclude that DEP's "experience and expertise in dealing with the regulation of [FPW] use and enforcement of the RTFA also supports a finding that the [spreading of FPW] is an accepted, well-regulated farming practice." *Gilbert*, 131 A.3d at 23.

We acknowledge that our holding today is in tension with the Commonwealth Court's decision in *Walck v. Lower Towamensing Twp. Zoning Hearing Bd.*, 942 A.2d 200 (Pa. Cmwlth. 2008). "Although a decision of the Commonwealth Court is not binding upon this Court, it can be considered as persuasive authority." *Nw. Sav. Bank v. Knapp*, 149

- 25 -

A.3d 95, 98 n.3 (Pa. Super. 2016) (citation omitted). In this case, however, we find the persuasive value of the Commonwealth Court's decision limited for several reasons.

In *Walck*, the Commonwealth Court upheld a zoning board's determination that storage of FPW was not normal farming activity. *Walck*, 942 A.2d at 209. This analysis, however, was based upon application of 3 P.S. § 501 *et seq.* The parties and the intervenor did not rely upon, nor did the Commonwealth Court cite, RTFA or section 6018.103. *See generally Walck*, 942 A.2d 200; Walck's and Lorah's Brief, 2007 WL 5516380; Lower Towamensing Township's Brief, 2007 WL 5516382; Lower Towamensing Township Zoning Hearing Board's Brief, 2007 WL 5516381. As noted above, section 6018.103 explicitly defines the term "normal farming operations" to include storage of FPW. The definition of "normal agricultural operation" in section 952 is broader than the term "normal farming operations." The failure of the parties, the intervenor, and the Commonwealth Court to read 3 P.S. § 501 *et seq. in pari materia* with section 6018.101 *et seq.* greatly diminishes the persuasive value we attribute to the Commonwealth Court's decision. *Cf.* 1 Pa.C.S.A. § 1932(b) ("Statutes *in pari materia* shall be construed together, if possible, as one statute."). Moreover, the Commonwealth Court reviewed the zoning board's determination under a highly deferential standard of review. *See Walck*, 942 A.2d at 205 n.5 (citation omitted). As noted above, in *Gilbert* our Supreme Court held that

- 26 -

we must review almost all determinations that an activity is a normal agricultural operation *de novo*. **See Gilbert**, 131 A.3d at 16-18. As such, notwithstanding the Commonwealth Court's decision in **Walck**, the relevant factors indicate spreading FPW is a normal agricultural operation.

Appellants argue that an agricultural operation cannot be normal if it is unlawful. **See** Appellants' Brief at 50-52. This argument fails for three reasons. First, the statutory definition of "normal agricultural operation," quoted above, does not incorporate therein a requirement that an activity be lawful to be considered a normal agricultural operation. More importantly, however, the General Assembly "is presumed not to intend any statutory language to exist as mere surplusage and, accordingly, courts must construe a statute so as to give effect to every word." **Commonwealth v. Walls**, 144 A.3d 926, 934 (Pa. Super. 2016), *appeal denied*, 470 EAL 2016 (Pa. Feb. 23, 2017) (citation omitted). In this case, reading a lawfulness requirement into the third requirement of section 954(a), *i.e.*, the normal agricultural operation requirement, would make the first requirement, *i.e.*, the lawfulness requirement, surplusage. As such, we cannot construe section 954(a) in the manner proposed by Appellants while giving effect to every word. Finally, as noted above, we conclude that Farmers' spreading of FPW was lawful, even if intermittently out of compliance with federal, state, or local laws.

Appellants also argue that, even if spreading FPW is a normal agricultural operation, storing it in a tank is not. This argument is without merit. As noted above, our General Assembly specifically considered the storage of FPW when passing section 6018.103. That section provides that storage of FPW constitutes a normal farming operation. For the reasons stated above, we ascertain no reason why storage of FPW should not be considered a normal agricultural operation when the definition of "normal agricultural operation" is broader than the definition of "normal farming operation."

We therefore hold that spreading FPW on farmland to provide nutrients for the soil is a normal agricultural operation. Moreover, storage of FPW is also a normal agricultural operation. As Farmers spread FPW to provide nutrients for the soil, their activities constituted normal agricultural operations. Accordingly, the third requirement of RTFA's statute of repose is satisfied.

In their final issue, Appellants argue that Farmers failed to satisfy the second requirement of section 954(a) because construction of the storage tank constituted a substantial change in the physical facilities of the agricultural operation. Farmers contend that this argument is without merit for three reasons. First, Farmers argue that even assuming *arguendo* that construction of the storage tank constituted a substantial change in the physical facilities of the agricultural operation, the statute of repose still bars

the instant action because the storage tank was constructed in April 2012 – more than one year prior to the filing of the instant complaint. Second, Farmers argue that even assuming *arguendo* that construction of the storage tank constituted a substantial change in the physical facilities of the agricultural operation less than one year prior to the commencement of the action, their spreading of FPW was covered by a nutrient management plan. Finally, Farmers argue that construction of the storage tank was not a substantial change in the physical facilities of the agricultural operation.

We begin with Farmers' argument that the storage tank became operational in April 2012 – more than one year prior to the filing of the instant complaint. In their second amended complaint, Appellants averred that:

> In approximately April of 2012, the [2,400,000] gallon storage tank was constructed on property owned and/or controlled by [Bowes Farm] and/or Camerer Farm[].
>
> Since the storage tank was erected, [JAB, Nicholas, and Bowes Farm] have transported and dumped, and/or participated in the transportation and dumping of the residual waste into the [2,400,000] gallon tank in such a manner that frequently releases offensive odors that have impaired and continue to impair [Appellants'] use and enjoyment of property and quality of life.

Appellants' Second Amended Complaint, 11/15/13, at 10 (paragraph number omitted). Appellants consistently repeated some form of this averment throughout their second amended complaint. *See **id.*** at 21 ("Upon reasonable belief, from approximately April of 2012 to the present, on a near

daily basis, [JAB, Bowes Farm, and/or Nicholas] have transported and dumped, caused to be transported and dumped, and/or directed the transportation and dumping of large quantities of residual waste from [Nicholas] into the [2,400,000] gallon storage tank[.]"); *id.* at 23 (same allegation as to Nicholas, Bowes Farm, and Camerer Farm); *id.* at 24 ("The vast amount of waste stored in the tank and frequent offensive and noxious odors and other emissions from the aforementioned waste storage activities of [Nicholas, Bowes Farm, and Camerer Farm] occurring from approximately April of 2012 to the present"); *id.* at 30; *id.* at 31; *id.* at 37; *id.* at 39; *id.* at 39-40; *id.* at 45; *id.* at 46-47; *id.* at 52-53; *id.* at 54; *id.* at 55; *id.* at 60-61; *id.* at 62; *id.* at 67-68; *id.* at 69; *id.* at 70; *id.* at 75-76; *id.* at 77; *id.* at 82-83; *id.* at 84; *id.* at 90-91; *id.* at 92; *id.* at 97-98; *id.* at 99; *id.* at 100; *id.* at 105-106; *id.* at 107; *id.* at 112-113; *id.* at 114-115; *id.* at 115; *id.* at 121; *id.* at 122; *id.* at 128; *id.* at 130; *id.* at 131; *id.* at 136; *id.* at 137; *id.* at 143; *id.* at 145; *id.* at 145-146; *id.* at 151; *id.* at 152; *id.* at 158; *id.* at 160; *id.* at 160-161; *id.* at 166; *id.* at 167; *id.* at 173; *id.* at 175; *id.* at 175-176; *id.* at 181; *id.* at 182; *id.* at 188; *id.* at 190; *id.* at 191; *id.* at 196; *id.* at 197-198; *id.* at 203-204; *id.* at 205; *id.* at 206; *id.* at 212; *id.* at 213; *id.* at 219; *id.* at 221; *id.* at 221-222; *id.* at 227; *id.* at 228; *id.* at 234; *id.* at 236; *id.* at 236-237; *id.* at 242; *id.* at 243; *id.* at 249; *id.* at 251; *id.* at 251-252; *id.* at 257; *id.* at 258; *id.* at 264; *id.* at

266; *id.* at 266-267; *id.* at 272; *id.* at 273; *id.* at 279; *id.* at 281; *id.* at 281-282; *id.* at 287; *id.* at 288.

Farmers, in their motion for summary judgment, argued that the storage tank became operational in April 2012. Farmers' Motion for Summary Judgment, 12/18/15, at 13. In support thereof, Famers cited to paragraph 46 of Appellants' second amended complaint. Farmers made this same argument in their brief in support of their summary judgment motion. Farmers' Brief in Support of Motion for Summary Judgment, 12/18/15, at 17.

In their brief in opposition to Farmers' summary judgment motion, Appellants asserted for the first time that the tank was not operational until at least July 13, 2012, less than one year prior to the filing of the instant complaint. **See** Appellants' Brief in Opposition to Motion for Summary Judgment, 1/19/16, at 20. In support of this argument, Appellants cited to the deposition testimony of Brett Bowes, the proprietor of Bowes Farm. **See** *id.*, *citing id.* at Exhibit 14.

Although not phrased as such before either the trial court or this Court, Farmers essentially argue that Appellants were barred from offering Brett Bowes' deposition testimony to disprove the averments made in their second amended complaint which serve as judicial admissions. In 1853, our Supreme Court first applied this principle under Pennsylvania common law. Specifically, our Supreme Court stated that, "When a man alleges a fact in a

court of justice, for his advantage, he shall not be allowed to contradict it afterwards. It is against good morals to permit such double dealing in the administration of justice." ***Willis v. Kane***, 2 Grant 60, 63 (Pa. 1853).

Our review of ***Willis*** and its progeny[17] elucidates the following requirements for an averment to be a judicial admission. First, the averment must be made in a verified pleading, stipulation, or similar document. Second, the averment must be made in the same case in which the opposing party seeks to rely upon it. In other words, an averment made in a pleading in an unrelated cause is not a judicial admission that precludes a party from contradicting that averment.[18] Third, the averment must relate to a fact and not a legal conclusion. Fourth, the averment must be advantageous to the party who made it. Finally, the fact must be plausible.

---

[17] Specifically, we reviewed ***Linefsky v. Redevelopment Auth. of the City of Philadelphia***, 698 A.2d 128, 133 (Pa. Cmwlth. 1997) (citations omitted); ***Gross v. City of Pittsburgh***, 686 A.2d 864, 867 (Pa. Cmwlth. 1996); ***Riddle v. Pennsylvania Dep't of Transp.***, 583 A.2d 865, 867 (Pa. Cmwlth. 1990) (citation omitted); ***Nasim v. Shamrock Welding Supply Co.***, 563 A.2d 1266, 1267 (Pa. Super. 1989) (citation omitted); ***Rizzo v. Haines***, 555 A.2d 58, 69 (Pa. 1989) (citations omitted); ***Jewelcor Jewelers & Distributors, Inc. v. Corr***, 542 A.2d 72, 75 (Pa. Super. 1988); ***Silco Vending Co. v. Quinn***, 461 A.2d 1324, 1326–1327 (Pa. Super. 1983); ***Dale Mfg. Co. v. Bressi***, 421 A.2d 653, 655 (Pa. 1980) (citation omitted); and ***Tops Apparel Mfg. Co. v. Rothman***, 244 A.2d 436, 438 (Pa. 1968) (citation omitted).

[18] The party may still be barred from contradicting the averment because of some other judicial principle, *e.g.*, judicial estoppel. We focus our attention, however, on the concept of judicial admissions.

In this case, the first three requirements are easily satisfied. Appellants' second amended complaint was verified by Appellants. The averments were made in the instant action, not another unrelated action. Third, whether the storage tank became operational in April 2012 is a factual, not legal, question. Thus, we focus our attention on the final two requirements to determine whether the averments made in Appellants' second amended complaint were judicial admissions which bind Appellants.

As to the fourth requirement, that the averments in Appellants' second amended complaint be advantageous to them, we find *DeMuth v. Miller*, 652 A.2d 891 (Pa. Super. 1995), *appeal denied*, 665 A.2d 469 (Pa. 1995), most analogous to the case *sub judice*. In *DeMuth*, the plaintiff averred in his verified complaint that, "[t]he [e]mployment [a]greement between the parties was not renewed or extended at its expiration on 31 May 1990." *Id.* at 894 (citation omitted; emphasis removed). At trial, the plaintiff attempted to prove that the parties had an employment contract past May 31, 1990. The defendant objected, arguing that the plaintiff was barred from arguing that an employment contract existed between the parties because he judicially admitted in his verified complaint that no such contract existed. This Court rejected that argument and held that the verified averment in the plaintiff's complaint was not a judicial admission. *See id.* at 894-895. In reaching that conclusion, this Court held that it was improper to look at the averment made in the plaintiff's complaint in a vacuum.

Instead, this Court held that the averment must be "viewed in the context of the remaining allegations and damages sought to be recouped." *Id.* at 894. Viewing the pleading as a whole, this Court stated that:

> [W]e fail to discern how it would be beneficial to the plaintiff to treat as an admission the expiration of the contract containing verbiage entitling him to dismiss the defendant for cause and seeking compensation for violation of the non-competition clause. Accordingly, given the non-beneficial aspects flowing from labelling [p]aragraph 5 as an admission (so as to preclude the plaintiff from offering evidence of the defendant's conduct as violative of a contract), we hold that [p]aragraph 5 does not rise to the level of a judicial admission.

*Id.* at 895 (citation omitted).

The factual averment that the storage tank became operational in April 2012 was not advantageous for Appellants. Although the emission of malodors from the storage tank was advantageous for Appellants, the averment that the storage tank became operational in April 2012 was not advantageous for Appellants. April 2012 was more than one year prior to the filing of the instant action and therefore that averment, if proven, would have meant that Appellants' claims were previously extinguished. This is similar to *DeMuth* where, if there were no employment contract between the parties, the plaintiff would not have been able to recover for a violation of the non-competition clause included therein. Thus, Appellants' averment that the storage tank became operational in April 2012 was not a judicial admission because it failed to satisfy the fourth prong of the test for an averment to be a judicial admission.

The only competent evidence presented to the trial court proved that the storage tank did not become operational until at least July 13, 2012, *i.e.*, less than one year prior to the filing of the instant complaint. Bowes Farm received a permit to construct the storage tank in April 2012. Appellants' Brief in Opposition to Motion for Summary Judgment, 1/19/16, at Exhibit 18. Brett Bowes testified that the storage tank, constructed on his farm, took three to four months to build after receiving the permit in April 2012. **See id.** at Exhibit 14. Thus, the only reasonable inference from Bowes' testimony was that the storage tank became operational, at the very earliest, in July 2012, *i.e.*, less than one year prior to commencement of the instant action. Farmers did not cite any evidence which contradicted Bowes' deposition testimony either in their brief in support of their summary judgment motion or in their brief before this Court. Thus, we conclude that the storage tank was not operational for at least one year prior to the filing of Appellants' complaint. Accordingly, Farmers failed to satisfy this option of the second requirement of section 954(a).

Next, we address Farmers' argument that the storage of FPW is covered by a nutrient management plan. In order to satisfy the second requirement of section 954(a) via the nutrient management plan option, the expanded or altered physical facilities must be addressed in a nutrient management plan approved prior to the expanded or altered physical facilities becoming operational. In other words, it is insufficient, for

purposes of this option of the second requirement, for the original physical facilities to be included in a nutrient management plan approved prior to the expanded or altered physical facilities becoming operational.

After a careful review of the certified record and section 954(a), we conclude that storage of FPW in the 2,400,000 gallon tank on Bowes Farm was not addressed in a nutrient management plan adopted prior to the storage tank becoming operational. Farmers attached the relevant nutrient management plans and modifications thereto to their motion for summary judgment. **See** Farmers' Motion for Summary Judgment, 12/18/15, at Exhibit AA. The only storage tanks mentioned in any of the nutrient management plans are the two storage tanks located on Nicholas' property. **See id.** (Nicholas "produces 40,000 gallons of [FPW per day] that is stored in two round concrete storages that measure 16 [feet] by 86 [feet] and 12 [feet by] 50 [feet] holding a total of 1,045,000 gallons."; Listing storage capacity of one tank as 175,000 gallons and capacity of other tank as 870,000 gallons.). There is no mention of the 2,400,000 gallon storage tank located on Bowes Farm. Thus, although the nutrient management plan covered the storage of FPW on Nicholas' property, and the spreading of FPW on the Bowes and Camerer Farms, it did not cover storage of FPW in the 2,400,000 gallon storage tank on Bowes Farm. As such, Farmers failed to satisfy this option for the second requirement of section 954(a).

Finally, Farmers argue the storage tank was not a substantial change in the agricultural operation. Preliminarily, we must address two issues of statutory interpretation as it relates to this option for satisfying the second requirement of section 954(a). As noted above, in order to satisfy the second requirement of section 954(a), (a) the conditions or circumstances that are the basis for the complaint must have existed substantially unchanged since the established date of operation or (b) if physical facilities have been substantially expanded or altered such facilities must have (i) operated for at least one year prior to the filing of the complaint or (ii) been addressed in a nutrient management plan approved prior to the commencement of such expanded or altered operation. *See* 3 P.S. § 954(a). Farmers appear to argue that the condition or circumstance that is the basis for the complaint is the spreading of FPW on the Bowes and Camerer Farms. Farmers also aver that the spreading of FPW on the Bowes and Camerer Farms has existed substantially unchanged since it began in 2011. Thus, according to Farmers, it is immaterial if there was a substantial change in the physical facility of the agricultural operation.

This argument fails. Specifically, under Farmers' proposed interpretation, an agricultural operation, such as storage, could substantially expand its physical facilities and still be protected by RTFA's statute of repose as long as the underlying operation, *e.g.*, spreading FPW, was not substantially changed. This would render the language in section 954(a)

relating to substantially expanded or altered physical facilities surplusage. As noted above, when interpreting a statute we presume the General Assembly did not intend superfluous language. *See Walls*, 144 A.3d at 934 (citation omitted). The clear implication of the General Assembly's inclusion of the language regarding substantially expanded or altered physical facilities is that substantially altered or expanded physical facilities *ipso facto* are a substantial change in the conditions or circumstances complained of so long as those substantially changed or altered physical facilities are related to the harm that is the subject of a complaint. In this case, the harm complained of encompasses malodors resulting from storage of FPW in the storage tank. Therefore, if the storage tank was a substantial expansion or alteration of the physical facilities, Appellants' action is not barred by RTFA's statute of repose.

No appellate court in this Commonwealth has ever decided whether the expansion or alteration of a facility was substantial under RTFA.[19] Black's Law Dictionary states that "substantial" is a synonym for "material." *See Black's Law Dictionary* 1280 (5th ed. 1979). Black's defines "material" as "[i]mportant." *Id. at* 880. We believe that this definition is appropriate

---

[19] In **Horne**, this Court acknowledged a question about whether the construction of a decomposition house was a substantial expansion or alteration of the physical facilities of the agricultural operation; however, this Court declined to decide the issue because even assuming *arguendo* that it was a substantial expansion or alteration, the decomposition house had been operational for at least one year prior to the filing of the complaint. **Horne**, 728 A.2d at 957 n.1.

for section 954(a). Specifically, this requirement under section 954(a) is meant to ensure that an agricultural operation not go from a tiny operation with little impact on neighbors to a massive operation greatly effecting the lives of neighbors without providing those neighbors with an opportunity to file a private nuisance action. In other words, RTFA is meant to protect the status quo of an agricultural operation along with minor expansion or alteration consistent with technological advancements. It is not meant to protect agricultural operations that undergo major changes which impact the lives of neighbors. Therefore, if the physical facilities of an agricultural operation undergo an important expansion or alteration, and that important expansion or alteration impacts the underlying condition or circumstance complained of, RTFA does not bar the action so long as the complaint is filed within one year of the date the substantially altered or expanded physical facility becomes operational.

Turning to the storage tank at issue in this case, the evidence presented indicates that the construction of the storage tank was a substantial change in the physical facilities of the agricultural operation. As noted above, the evidence before the trial court was that the storage tank is capable of holding 2,400,000 gallons of FPW. To give some idea of how much that is, it would take a box approximately 68.5 feet long, 68.5 feet wide, and 68.5 feet high in order to hold 2,400,000 gallons of FPW.

Visualized another way, 2,400,000 gallons would cover a football field (including endzones) with over five and one-half feet of FPW.

The size of the storage tank is not the only indicator of how substantial of an expansion the storage tank was to the physical facilities of the agricultural operation. Prior to April 2012, Bowes Farm lacked any storage facility for FPW. Thus, this was not a location that stored hundreds or even tens of millions of gallons of FPW that added a relatively small 2,400,000 gallon storage tank. Instead, this was a situation in which Bowes Farm went from storing no FPW to an FPW storage capacity of 2,400,000 gallons.

As noted above, it took three to four months for construction of the storage tank. In other words, this was not a small construction job in which the tank was built in a few hours, days, or even weeks. Farmers attached to their summary judgment motion an exhibit in which Nicholas' proprietor stated that the storage tank cost $300,000.00 to construct. *See* Farmers' Motion for Summary Judgment, 12/18/15, at Exhibit B. All of these factors lead us to hold that the construction of the storage tank on the Bowes Farm was a substantial expansion to the physical facilities of the agricultural operation. As noted above, the expanded physical facility did not become operational until at least July 2012, *i.e.*, less than one year prior to the filing of Appellants' complaint. Therefore, Farmers failed to satisfy the second requirement of section 954(a) as it relates to the storage of FPW in the 2,400,000 gallon tank located on Bowes Farm.

Our conclusion that the construction of the storage tank on Bowes Farm was a substantial change in the physical facilities of the agricultural operation, and thus a substantial change in the conditions or circumstances complained of in Appellants' second amended complaint, however, does not mean that Appellants may continue prosecuting their complaint as it relates to the spreading of FPW.  To the contrary, the storage of FPW is separate and distinct from the spreading of FPW.  This is evidenced by the fact that FPW was spread on the Bowes and Camerer Farms for approximately 18 months without any storage located on Bowes Farm and/or Camerer Farm.  Moreover, section 6018.103, states that normal farming operations include the use **or** storage of FPW.  35 P.S. § 6018.103.  The use of the disjunctive "or" in the definition clearly indicates that storage of FPW, without regard to use, is a normal agricultural operation.  Similarly, use of FPW, without regard to storage, is also a normal agricultural operation.  In this case, Appellants separated the claims regarding storage of FPW from the claims regarding the spreading of FPW.

This separation of the claims relating to spreading and storage of FPW is consistent with the plain language of section 954(a).  It is also consistent with other tools of statutory interpretation.  Finally, it is consistent with the overall purpose of RTFA.  Permitting Appellants to proceed with their claims relating to the spreading of FPW, when the statute of repose previously extinguished such claims, would have a chilling effect on farmers in this

Commonwealth. Specifically, farmers would be discouraged from expanding their operations if they lost all RTFA protections because of one substantial change in the physical facilities of the farm. By separating the claims, we not only uphold the viable elements of Appellants' complaint, but also uphold the plain language and spirit of RTFA.

In sum, we hold that a violation of a federal, state, or local law does not *ipso facto* render an agricultural operation unlawful. In other words, a lawful use is not rendered unlawful simply because an owner may have been cited for an infraction for noncompliance in connection with the use.[20] Instead, we hold that an agricultural operation is lawful if it substantially complies with relevant federal, state, and local laws. In this case, Farmers lawfully spread FPW for at least one year prior to the filing of Appellants' complaint. We also hold that spreading FPW on farmland to provide nutrients for the soil, and storage of FPW in tanks, constitute normal agricultural operations. Finally, we conclude that construction of the 2,400,000 gallon storage tank constituted a substantial change in the physical facilities of the agricultural operation less than one year prior to commencement of this litigation. Thus, we conclude that Farmers satisfied all three requirements of section 954(a), RTFA's one-year statute of repose, as it relates to the spreading of FPW; however, Farmers failed to satisfy the

---

[20] It is possible that a serious violation or continued noncompliance may lead to a finding that the operation is unlawful, but that is not the situation in this case.

second requirement of section 954(a) with respect to the storage of FPW in the 2,400,000 gallon tank located on Bowes Farm.  Accordingly, we affirm the judgment entered with respect to the claims arising from the spreading of FPW and vacate the judgment entered with respect to the claims arising from the storage of FPW in the 2,400,000 gallon storage tank located on Bowes Farm.  We remand this case to the trial court for further proceedings consistent with this opinion including ruling, in the first instance, on the portion of Farmers' summary judgment motion arguing that Appellants' nuisance claim fails as a matter of law.[21]

Judgment affirmed in part and vacated in part.  Case remanded. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2017

---

[21] In their summary judgment motion, Farmers argued that the utility of their activities outweigh any harm to Appellants.  No party briefed or argued this issue before this Court.  Moreover, the trial court did not address the issue in its opinion granting summary judgment.  Although we could reach the issue because we may affirm the trial court's decision on any basis, **Commonwealth v. Rosser**, 135 A.3d 1077, 1087 (Pa. Super. 2016) (*en banc*) (citation omitted), we exercise our discretion and remand this matter so that the trial court may rule on the issue in the first instance.