J-A32041-17 & J-A32042-17

2018 PA Super 77

| | | |
|---|---|---|
| JANE & JEFF BURLINGAME, PAM HOLTER, | : | IN THE SUPERIOR COURT OF |
| JAMES & JENNIFER HYDE, SHANE & | : | PENNSYLVANIA |
| CHANTEL LEVARDI, KIP & ANGELA MCCABE, | : | |
| JOHN & VERONICA MOLITORIS, APRIL & | : | |
| MATTHEW SNYDER, JACQUELINE & BARRY | : | |
| TITUS, JEFFREY & COLLEEN WALKER, JOHN | : | |
| & PATRICIA KACHURKA, DWAYNE & | : | |
| SANDRA HILTON, LESLEY BETZ, JOHN & | : | |
| SHARON YASNESKI, GERALD & JACQUELINE | : | |
| HITTLE, SCOTT KARCHNER, STEPHIN & | : | |
| MARIE CARGILL, JAMES & ERIN MORAN, | : | |
| BETH KISHBAUGH-ALBA, ROBERT & | : | |
| CYNTHIA LOMBARD, ANTONIO & KERRI | : | |
| TROIANI, JASON & MELANIE LEAR, DENNIS | : | |
| & ANDREA EVENSEN, RICHARD & EMILY | : | |
| WEAVER, KEITH & LISA SEELY, RICHARD & | : | |
| DOLORES MAYO, ZACHARY & HEATHER | : | |
| GETKIN, MARY MITCHEM, HUSHANG TATAR, | : | |
| DAVIT SZATKOWSKI, SUSAN SLUSSER, | : | |
| VICTOR & CHRIS BOWES, CHARLES & | : | |
| LAURA NAUS, ROBERT & LOIS ALBERTSON, | : | |
| GARY & TAMMY WANCZAK, MICHAEL & | : | |
| MICHELLE MONTECALVO, MARC & KATHRYN | : | |
| NESPOLI, KARLEEN FULLER, HELENA | : | |
| SAMSEL, JEFFREY & ANNAMAE KANTOR, | : | |
| JOSEPH & CONNIE NESPOLI, DONALD & | : | |
| KATHLEEN BOHL, GARY & TAMMY SWANK, | : | |
| SUSAN DALTO, DAVIT & TAMI BERHEISER, | : | |
| JOSEPH & MICHELLE PASSARETTI, THOMAS | : | |
| CICINI, JR. & ELISSABETH CICINI, ROBERT | : | |
| L. ALBERTSON, SR., KEITH & JUDITH | : | |
| WEAVER, NICHOLAS COLEMAN, STEPHEN & | : | |
| GINNY CRAKE, BRESSI ARNDT, JOHN & LISA | : | |
| ARNDT, TERRY L. BOYER, LAMONT & | : | |
| RUTHANN BROWN, DAVID & GINA BROWN, | : | |
| THOMAS & MARIE CICINI, PETER & JOANN | : | |
| COLONE, WILLIAM CONNER, JR. & JUDY | : | |
| CONNER, ROGER & MICHELE CRAKE, FRANK | : | |
| & LINDA CRAYTON, RICHARD HOLLOWAY, | : | |
| LOUELLA S. JACKSON, SAMUEL & SUSAN | : | |
| JAFFIN, RAYMOND KASHMER, ROBERT | : | |

J-A32041-17 & J-A32042-17

KOWALSKI, SR. & DIANE KOWALSKI,                      :
LORAINE LAUBACH, MICHAEL A. MONICO,                  :
JR., JOSEPH PROCIDA, CODIE RIMMER,                   :
GABRIELLE ROMAN, ROBERT & CAROL                      :
SEIGFRIED, ROBERT SUKEL, CRAIG &                     :
JESSICA TAYLOR, ANDREW & JESSICA                     :
WALTER, FRANCIS & ANN YOSH, HAROLD &                 :
SAMANTHA PIASECKI, JEFF & MINDY                      :
BROWN, AUDREY MALONEY, JEFF BECKER,                  :
DAVID BECKER, THOMAS BECKER, BARBARA                 :
KAMPF, DOROTHY KAMPF, MICHAEL                        :
MALINOWSKI, ORVILLE KNEEZLE, BEVERLY                 :
HARMON, JAMES LABAR, AND LOUISE                      :
KROLIKOWSKI,                                         :
                                                     :
                  Appellants                         :
                                                     :
                    v.                               :
                                                     :
PAUL & SUZANNA M. DAGOSTIN, DOUGLAS                  :
ZEHNER, AND COUNTRY VIEW FAMILY                      :
FARMS, LLC,                                          :
                                                     :
                  Appellees                          :        No. 799 MDA 2017

Appeal from the Order Entered April 13, 2017
in the Court of Common Pleas of Luzerne County
Civil Division at No(s): 2015-2092

KIP MCCABE, SR. & ANGELA MCCABE,                     :   IN THE SUPERIOR COURT OF
APRIL & MATTHEW SNYDER, JACQUELINE &                 :          PENNSYLVANIA
BARRY TITUS, JEFFREY & COLLEEN                       :
WALKER, PAM HOLTER, MARK & GLENDA                    :
STERNER, JOHN & VERONICA MOLITORIS,                  :
MICHAEL MALINOWSKI, WILLIAM & KELLY                  :
GROZIER, SHANE & CHANTEL LEVARDI,                    :
HAROLD & SAMANTHA PIASECKI, JAMES &                  :
JENNIFER HYDE, JANE BURLINGAME,                      :
DWAYNE & SANDRA HILTON, CATHY                        :
MCDANIELS, SHANNON KOCH, ROBERT                      :
KOWALSKI, SR., KARLEEN FULLER, JASON                 :
& MELANIE LEAR, BETH ALBA, WILLIAM                   :

- 2 -

FEDDER, HEATHER FLANNERY, JODY : 
KUCZENSKI, BRIAN BETZ, CALISTRIA : 
PITKIN, TONI MORMANDO, THOMAS & AMY : 
DIBATTISTA, MICHAEL MONTECALVO, : 
THOMAS & MARIE CICINI, ERIN & JAMES : 
MORAN, CHARLES BENSCOTER, GENE & : 
ROSE BLOCKUS, ANNA FARRUGGIO, : 
DARRELL & NORMA JONES, COLLEEN & : 
SHAWN GOLOMB, ANDREA & DENNIS : 
EVENSEN, SCOTT & MOLLY KERN, ESTEE : 
BECK, MARION & JOHN CELONA, ROBERT : 
SUKEL, BOB ALBERTSON, JACKSON : 
TRAUGH, SANTE D'AMBROSIO, KELLIE : 
SOBERICK, JEFFREY EYER, KEN & : 
VERONICA LOCKARD, ERNEST COLE, : 
DINESH MERTA, MICHAEL WHITEMIRE, : 
DEANNA SHUCKERS, FRED KITCHEN, KERRI : 
& TONY TROIANI, JEROME & JUDITH : 
GOLOMB, JEFFERY CAIN, BETTE RYAN, : 
STEVE KINNEY, SCOTT & CHRISTINE : 
HOOK, DAVE & GERA ZEITLER, ANDREW & : 
JESSICA WALTER, PAMELA HOLTER, SUSAN : 
SLUSSER, DAVID R. SZATKOWSKI, PAUL : 
FRICKS, CAROL & ROBERT SEIGFRIED, : 
LAMONT BROWN, AUDREY MALONEY, : 
HAROLD & SAMANTHA PIASECKI, LENARD : 
BADOLATO, MARK & MARCELLA BENISH, : 
DAVID & SUE BOGART, KEITH & HEATHER : 
BOTTO,STEVEN BOWER, JENNIFER : 
BURNS, CAROL & ROBERT CHAMBERS, BOB : 
CLARK, STELLA DIETRICH, LORI DENNIS, : 
LINDA EYER, KEN FERGUSON, RANDY & : 
CANDICE FIOREY, KAREN FULLER, : 
DONALD GOFF, LEWIS GRIFFITHS, : 
NANCY GUARD, JIM HOLLOWAY, HERBERT : 
& JUDY HARMON, AND BEVERLY HARMON, : 
  : 
        Appellants : 
  : 
        v. : 
  : 
PAUL & SUZANNA M. DAGOSTIN, AND : 

- 3 -

J-A32041-17 & J-A32042-17

DOUGLAS ZEHNER,                          :
                                         :
          Appellees                      :      No. 800 MDA 2017

          Appeal from the Order Entered April 13, 2017
          in the Court of Common Pleas of Luzerne County
          Civil Division at No(s): 2014-6202

BEFORE:   OTT, DUBOW, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.:                 **FILED MARCH 29, 2018**

        Before us are identical issues raised in two appeals from orders

granting summary judgment to Defendants[1] in nuisance actions filed by

Plaintiffs.[2]  We affirm.

        The relevant facts are as follows.  The Dagostin family has operated

Will-O-Bett Farm in Salem Township, Luzerne County, since 1955.  The farm

was initially a dairy farm, but in the 1990s switched to a beef farm while

maintaining small numbers of goats, chickens, and pigs.  In 2011, the

Dagostins decided to convert their farm to a concentrated animal feeding

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The defendants in the appeal filed at 799 MDA 2017 are Paul and Suzanna
Dagostin, Douglas Zehner, and Country View Family Farms (Country View),
all of whom are alleged to have had some responsibility for the management
of the agricultural operation at issue.  The Dagostins and Zehner are the
named defendants in the appeal filed at 800 MDA 2017.  We refer to all
defendants in both actions collectively as Defendants, as the claims against
them and bases for judgment in their favor are the same, and they filed joint
briefs in these appeals.

[2] The term Plaintiffs refers collectively to those individuals listed as
appellants in the captions above, which were generated from the captions on
the respective notices of appeal.

- 4 -

operation (CAFO) for pigs, where animals owned by Country View stay for a few months while they grow from about 60 to 270 pounds.

Defendants were granted a condictional use to build the CAFO from the township after a public hearing in 2011; had a land development plan conditionally approved by the township in February 2012; and had a nutrient management plan approved by a commission of the Pennsylvania Department of Agriculture on May 15, 2012. The physical facilities were constructed, including a 40,000-square-foot finishing barn and a 1.8-million-gallon storage pit for containing the hog urine and feces generated by the up to 4,800 hogs that are concentrated[3] at the CAFO. The first shipment of pigs arrived on January 23, 2013. Defendants aver that they began spreading the liquid swine manure (LSM) collected from the CAFO onto the surrounding fields of their farm in June 2013. Plaintiffs say the LSM did not begin to be spread until April 2014.

Separate complaints, one on May 16, 2014, and another on April 27, 2015, were filed by Plaintiffs, who are different groups of neighbors claiming that the spread of the LSM created a private nuisance. After rounds of

---

[3] Based upon the numbers, the finishing barn offers, at most, eight and one third square feet per 60-to-270-pound hog. Make no mistake about it. The RTFA is not an attempt to preserve the traditional family farm, such as the 160 acres worked in Wisconsin by the family of this writer's wife since 1845. The statute is a paean to agribusiness. ***See generally*** John Ikerd, ***10 Reasons to Oppose "Right to Farm" Amendments***, Civil Eats (July 17, 2014), https://civileats.com/2014/07/17/10-reasons-to-oppose-right-to-farm-amendments/.

preliminary objections and amended complaints, Defendants moved for summary judgment based upon subsection 954(a) of the Right to Farm Act (RTFA), 3 P.S. §§ 951-957. The trial court agreed with Defendants and granted judgment as a matter of law in their favor. Plaintiffs timely filed notices of appeal.

Plaintiffs present this Court with the following questions.

1. Did the trial court err as a matter of law and/or abuse its discretion in holding on summary judgment that [Plaintiffs'] nuisance claim is barred by the RTFA's one-year statute of repose because, according to the trial court, calculation of the one-year period began when the first shipment of pigs was delivered on January 23, 2013[,] despite the fact that there was a substantial change in the conditions or circumstances complained of after this date?

2. Did the trial court err as a matter of law and/or abuse its discretion in holding on summary judgment that [Plaintiffs'] nuisance claim is barred by the second provision of [sub]section 954(a) because, according to the trial court, there was an approved nutrient management plan in place despite the fact that there was no substantial expansion or substantial alteration of the physical facilities of the CAFO?

Plaintiffs' Briefs[4] at 2-3 (suggested answers and trial court answers omitted).

We begin with an examination of the applicable law. The RTFA is prefaced with an express statement of the policy.

It is the declared policy of the Commonwealth to conserve and protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. When nonagricultural land uses extend into

_____

[4] The briefs of both Plaintiffs and Defendants are nearly identical in both appeals. Unless otherwise indicated, cited material is on the same page in both briefs.

agricultural areas, agricultural operations often become the subject of nuisance suits and ordinances. As a result, agricultural operations are sometimes forced to cease operations. Many others are discouraged from making investments in farm improvements. It is the purpose of this act to reduce the loss to the Commonwealth of its agricultural resources by limiting the circumstances under which agricultural operations may be the subject matter of nuisance suits and ordinances.

3 P.S. § 951. In furtherance of this policy, subsection 954(a) of the RTFA provides in relevant part as follows.

No nuisance action shall be brought against an agricultural operation which has lawfully been in operation for one year or more prior to the date of bringing such action, where the conditions or circumstances complained of as constituting the basis for the nuisance action have existed substantially unchanged since the established date of operation and are normal agricultural operations, or if the physical facilities of such agricultural operations are substantially expanded or substantially altered and the expanded or substantially altered facility has either: (1) been in operation for one year or more prior to the date of bringing such action, or (2) been addressed in a nutrient management plan approved prior to the commencement of such expanded or altered operation pursuant to section 6 of the act of May 20, 1993 (P.L. 12, No. 6), known as the Nutrient Management Act,[5] and is otherwise in compliance therewith….

3 P.S. § 954(a).

Important in the instant case, the RTFA provides no definition for the term "agricultural operation." However, in the agriculture statutes governing nutrient management and odor management, "agricultural

---

[5] The 1993 Act was replaced in 2005; the applicable statutory provision is now found at 3 Pa.C.S. § 506. The replacement statute did not change the law in any way to impact resolution of this case.

operations" are defined as "The management and use of farming resources for the production of crops, livestock or poultry." 3 Pa.C.S. § 503.

Our Supreme Court has ruled that subsection 954(a) is a statute of repose, as opposed to a statute of limitations.

> A statute of repose ... limits the time within which an action may be brought and is not related to the accrual of any cause of action; the injury need not have occurred, much less have been discovered. Unlike an ordinary statute of limitations which begins running upon accrual of the claim, the period contained in a statute of repose begins when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted.

*Gilbert v. Synagro Central, LLC*, 131 A.3d 1, 15 (Pa. 2015).

The RTFA has not always existed in its current state. Rather,

> [i]n 1998, Pennsylvania amended its right-to-farm law to provide further protection to farmers. A portion of the amendment was designed to immunize farmers who sought to expand or substantially change their operations from nuisance suits. Because the original law's one-year statutory period created a deterrent to investment, the amendment sought to give farmers a way to opt out of the problematic one-year period. Since the amendment, a farmer may avoid the one-year period by developing a nutrient management plan in compliance with state law prior to substantially changing his operation. As such, the farmer is provided with immediate immunity from suit and the deterrent to investment is removed.

Jennifer L. Beidel, *Pennsylvania's Right-to-Farm Law: A Relief for Farmers or an Unconstitutional Taking?*, 110 Penn St. L. Rev. 163, 171–72 (2005) (footnotes omitted). *See also* House of Representatives Agriculture and Rural Affairs Committee Minutes, 9/23/1997, at 1 ("[T]his bill amends the existing 'Right to Farm' law by ensuring that the protections

afforded farmers under the new law become immediately available to an expanding farm operation upon approval of a Nutrient Management Plan….”); House Committee on Appropriations, Senate Bill 682 Fiscal Note, 11/24/1997 (“Senate Bill 682 provides farmers with an immediate protection from nuisance suits after expansion of an agricultural operation if the operation has an approved nutrient management plan prior to the commencement of the expanded operation.”).

“Nutrient” is defined as “[a] substance or recognized plant nutrient, element or compound which is used or sold for its plant nutritive content or its claimed nutritive value.  The term includes, but is not limited to, livestock and poultry manures, compost as fertilizer, commercially manufactured chemical fertilizers, sewage sludge or combinations thereof.”  3 Pa.C.S. § 503.  The definition of “nutrient management plan” is “[a] written site-specific plan which incorporates best management practices to manage the use of plant nutrients for crop production and water quality protection consistent with the criteria established in sections 504 (relating to powers and duties of commission) and 506 (relating to nutrient management plans).”  *Id.*

This Court must decide as a matter of law whether the statute is applicable.  In so doing, we must determine whether the following three prongs have been met:

(1) the agricultural operation against which the action is brought must have lawfully operated for at least one year prior to the filing of the complaint; and

(2) the conditions or circumstances that are the basis for the complaint are normal agricultural operations; and

(3) either the conditions or circumstances that are the basis for the complaint must have existed substantially unchanged since the established date of operation, or if the physical facilities have been substantially expanded or altered such facilities must have: (i) operated for at least one year prior to the filing of the complaint or (ii) been addressed in a nutrient management plan approved prior to the commencement of such expanded or altered operation.

We begin by noting what is not in dispute. Plaintiffs do not contest that the spreading of LSM is a normal agricultural operation; hence the second prong of the test has been met. Also, it is the spreading of the LSM that is the "condition[] or circumstance[] complained of as constituting the basis for the nuisance action" for deciding the third prong of the test.[6] 3 P.S. § 954(a). However, when those conditions began to exist is disputed by the parties. Defendants claim they began the spreading of LSM in June 2013. Plaintiffs claim that the spreading of LSM did not begin, or at least not exist substantially unchanged, until 2014, when more than 90,000 gallons of LSM were spread in a single day, as opposed to the 90,000 gallons Defendants claim was spread in all of 2013. Whether that factual dispute is

_____

[6] Plaintiffs acknowledge that they also base their claims on odors emanating from the storage pit itself. Plaintiffs' Briefs at 4-5. However, their argument focuses on the spreading of LSM, an activity that they contend began less than one year before their complaints were filed. Based upon our resolution, we need not separate Plaintiffs' claims.

of consequence turns on whether the agricultural operation at issue in the first prong of the test is the farm itself or is instead the CAFO.

An examination of the three appellate decisions that address application of section 954(a) to bar nuisance claims reveals that no Court has clarified exactly what qualifies as "the agricultural operation against which the action is brought." 3 P.S. § 954(a). The first time this Court considered the statute was in **Horne v. Haladay**, 728 A.2d 954 (Pa. Super. 1999). In that case, Horne claimed, *inter alia*, that the defendants created a private nuisance in the form of daily strong odors from their poultry business. **Id.** at 955. The Court determined that the poultry farm was a normal agricultural operation. **Id.** at 958. Further, the Court ruled that the defendants' operation was lawful because Horne came forth with no evidence to create a material issue of fact that the operation violated any statutes or regulations. **Id.** Regarding the timing, the Court stated:

> the record clearly reveals that [the defendants] began operation of their poultry house in November of 1993, when they stocked the house with 122,000 laying hens. The only change in their operation which could even be considered substantial took place in August of 1994, when [the defendants] placed a decomposition house into operation. [Horne] did not institute his suit until November 21, 1995, and he has not alleged that the poultry farming operation has changed in any manner since that time, except perhaps to concede that certain conditions have improved since the decomposition house was placed into operation. Thus, [the defendants'] poultry house was lawfully in operation in a substantially unchanged manner for more than one year prior to the date on which [Horne] filed his nuisance suit, and the action is, therefore, time-barred by 3 P.S. § 954(a).

*Id.* at 956-57. The Court offered the following discussion of the determination of when the clock started running for Horne:

> For the purposes of this appeal only, we have ruled that [the defendants'] construction and subsequent use of the decomposition house was a substantial change in their poultry operation sufficient to start the one-year limitations period anew. We do so because even if we employ this later date to the benefit of [Horne], his nuisance action is nevertheless barred by 3 P.S. § 954(a). It is, of course, arguable that the one-year period began in November of 1993, when the chicken house was stocked with 122,000 laying hens or in the Spring and Summer of 1994, when [Horne] began to experience problems with flies and odor.

*Id.* at 957 n.1. Because it made no difference to the outcome, the **Horne** Court declined to establish what event or events actually began the running of the one-year statute.

Our Supreme Court ruled upon the application of subsection 954(a) in **Gilbert**. In that case, the defendants were the owners/operators of a farm and a company that, beginning in 2006, provided the farm with fertilizer in the form of biosolids, a foul-smelling treated sewage sludge. **Gilbert**, 131 A.3d at 3. In 2008, two groups of neighbors sued the defendants, claiming, *inter alia*, that the use of the biosolids created a private nuisance. Our Supreme Court did not decide whether the first prong of the test we state on page 6 above was based upon the operation of the farm itself, or the farm's use of biosolids, as the result was the same in either case:

> Whether "agricultural operation" refers to the farm or to the farming process, § 954(a)'s one-year requirement is met here, as [the plaintiffs'] action was not filed until 2008, well beyond

the one-year period. Furthermore, even if the change to biosolids was a substantial change from prior operations, such change occurred more than two years prior to [the plaintiffs'] suit, rendering the suit untimely.

*Id.* at 19 (citations omitted). The case thus turned on the second prong of the test—whether the use of biosolids was a normal agricultural operation—and the Court concluded it was. *Id.* at 19-23. Accordingly, the defendants were entitled to summary judgment based upon subsection 954(a). *Id.*

This Court again decided a case involving the RTFA's statute of repose in *Branton v. Nicholas Meat, LLC*, 159 A.3d 540 (Pa. Super. 2017). In that case, the defendants were a slaughterhouse that produced solid and liquid nutrient-filled food processing waste (FPW), and two farms that began using the FPW as fertilizer in 2011. *Id.* at 543. The plaintiffs filed a complaint in June 2013 stating nuisance claims. In considering the first prong of the test (the agricultural operation against which the action is brought must have lawfully operated at least one year prior to the filing of the complaint), this Court noted that *amicus curiae* Pennsylvania Farm Bureau contended that the first prong "refers to the farm itself and not the specific agricultural activity conducted on the farm." *Id.* at 549 n.11. Observing that this issue had been briefed but not decided in *Gilbert*, and not briefed in the case before it, the Court did not reach the issue, as both the operation of the farm and the specific activity thereon began more than one year prior to the filing of the complaint. *Id.*

Thus, the Courts in **Horne**, **Gilbert**, and **Branton** noted different possible interpretations of the term "agricultural operation," but declined to decide the issue because the result was the same regardless. Because the meaning of the term could determine the outcome of the instant case, we must make the first definitive ruling as to the meaning of "agricultural operation" in the first prong of the test for application of subsection 954(a).

The trial court determined that the agricultural operation is the CAFO.[7] Trial Court Opinion, 4/13/2017, at 6. Plaintiffs agree; Defendants do not.[8] With the CAFO as the agricultural operation that is the starting point for the test for subsection 954(a)'s applicability, they claim that the third prong of the test is not satisfied here. Plugging the relevant terms into the test we set forth on page 7 *supra*, the result would be as follows.

> (1) The CAFO operated for at least one year prior to the filing of Plaintiffs' nuisance complaints; and
>
> (2) the spreading of LSM is a normal agricultural operation; **but**

---

[7] Again, whether subsection 954(a) is applicable is a jurisdictional question of law. **Gilbert**, 131 A.3d at 15. Hence, our standard of review is *de novo*, and our scope of review is plenary. **See**, **e.g.**, **Ramalingam v. Keller Williams Realty Grp., Inc.**, 121 A.3d 1034, 1042 (Pa. Super. 2015). Furthermore, as is always the case, "we are not limited by the trial court's rationale and that we may affirm on any basis." **Blumenstock v. Gibson**, 811 A.2d 1029, 1033 (Pa. Super. 2002).

[8] Although at times Defendants point to the CAFO as the agricultural operation against which the action was brought, **see**, **e.g.**, Defendants' Briefs at 10, the pertinent part of their argument instead views the construction of the CAFO facilities as a substantial alteration to the physical facilities of the Will-O-Bett Farm. **See** Defendants' Briefs at 25-32.

(3) **neither** has the spreading of LSM existed substantially unchanged since the established date of the CAFO, **nor** have the CAFO's physical facilities been substantially expanded or altered.

In other words, Plaintiffs' position is that Defendants' obtaining and operating the CAFO under a nutrient management plan does not extinguish Plaintiffs' nuisance claims because Defendants' spreading of the LSM, which began at some disputed time after the CAFO had commenced operations, was not commensurate with a substantial expansion or alteration of the CAFO's physical facilities. Plaintiffs' Briefs at 20-28.

Plaintiffs' interpretation is contrary to both the language and the purpose of the RTFA. Rather, we hold that the agricultural operation in question in the first prong of the test in this case is the Will-O-Bett Farm, not the CAFO. The relevant statutory language is "No nuisance action shall be brought against an agricultural operation…." 3 P.S. § 954(a). Plaintiffs did not bring actions against the CAFO or against the spreading of LSM; rather those are the "conditions or circumstances complained of" by Plaintiffs. *Id.* Plaintiffs brought their actions against the owners and operators of the farm, not the farming process. Indeed, the LSM is not spread on the CAFO—it is spread on the surrounding fields of the Will-O-Bett Farm that are farmed by Defendant Zehner.

This interpretation is also consistent with the legislative history, which speaks of providing "farmers with an immediate protection from nuisance

- 15 -

suits after expansion of an agricultural operation if the operation has an approved nutrient management plan prior to the commencement of the expanded operation." House Committee on Appropriations, Senate Bill 682 Fiscal Note, 11/24/1997. It was the agricultural operation that is the Will-O-Bett Farm that chose to expand by building the CAFO, having first obtained approval for a nutrient management plan—a site-specific plan prepared for the Will-O-Bett Farm, for manure to be spread on the farmland surrounding the CAFO. Hence, viewing the agricultural operation as the farm that chose to expand furthers the FTRA's stated goal: "encourage the development and improvement of its agricultural land" and to stop farmers from being "discouraged from making investments in farm improvements" by the threat of nuisance suits. 3 P.S. § 951.

Having determined that the agricultural operation in the instant case is the Will-O-Bett Farm, and that neither the operation of the CAFO nor the spreading of LSM has existed since the farm began operating in 1955, we consider whether the farm's "physical facilities have been substantially expanded or altered." 3 P.S. § 954(a). It is beyond peradventure that the construction of the 40,000-square-foot CAFO and its 1.8-million-gallon storage pit was a substantial expansion and alteration to the physical facilities of the Will-O-Bett farm. *Accord Branton*, 159 A.3d at 555 (holding that the construction of a 2.4 million gallon storage tank for food processing waste constituted a substantial change to the physical facilities).

Plaintiffs do not dispute that Defendants obtained approval for a nutrient management plan before they started operating the CAFO.[9] Under the plain language of the statute, because the construction of the CAFO was a substantial alteration to a lawfully-operated agricultural operation, and the condition Plaintiffs complain of had been addressed in a nutrient management plan approved prior to its commencement, Plaintiffs have no nuisance claims against Defendants related to the spread of the LSM unless the record shows that Defendants have failed to comply with the nutrient management plan.

Plaintiffs do proffer an argument that Defendants have not operated in compliance with the nutrient management plan. Plaintiffs' Briefs at 28-29. In support, Plaintiffs cite only to the affidavit of Malcolm Pevyak. According to his affidavit, Pevyak took some samples of water that ran off of Defendants' land before and after the switch to LSM and sent them off to a lab, and the results showed increased amounts of bacteria "as a result of the manure application." Affidavit of Malcolm Plevyak, 8/29/2016, at ¶ 11. However, there is no indication from Plaintiffs that Pevyak is qualified to

---

[9] The Dagostins attached versions of the Will-O-Bett Farm's nutrient management plan to their motion for summary judgment. Dagostins' Motion for Summary Judgment, 7/1/2016, at Exhibit 1a to Exhibit D. It specifies, for example, on which fields of the farm the LSM is to be spread, when, how, and at what rate.

offer opinion causation testimony as to the cause of the test results.[10] Nor do either Pevyak's affidavit or Plaintiffs' briefs explain what regulation or provision of the nutrient management plan Defendants have violated. Indeed, Pevyak in his affidavit acknowledged that when he reported his findings to the Department of Environmental Protection (DEP), "the DEP would return my calls and tell me they found nothing." *Id*. at ¶ 13.

Because the record does not contain any indication otherwise, the trial court correctly concluded that "all of the competent evidence before the [c]ourt indicates that the CAFO has … been in full compliance with its approved nutrient management plan." Trial Court Opinion, 4/13/2017, at 6.

In sum, our application of subsection 954(a)'s three-prong test is as follows.

> (1) The Will-O-Bett Farm lawfully operated for at least one year prior to the filing of Plaintiffs' nuisance complaints; **and**
>
> (2) the spreading of LSM in the fields of the Will-O-Bett Farm is a normal agricultural operation; **and**
>
> (3) while the spreading of LSM on the fields of the Will-O-Bett Farm (and the operation of the CAFO, for that matter), have not existed since the established date of the Will-O-Bett Farm, the Will-O-Bett Farm's physical facilities were substantially expanded or altered by the building of the CAFO, and were addressed in a nutrient management plan approved prior to the commencement of the CAFO's operation, and with which the Will-O-Bett Farm has operated in compliance at all relevant times.

---

[10] At oral argument on the motions for summary judgment in the trial court, Plaintiffs acknowledged that they would need an expert to establish that there was pollution caused by Defendants. N.T., 11/3/2016, at 80.

We do not doubt that Plaintiffs are legitimately aggrieved by the odors associated with the Will-O-Bett's expanded/altered operation.[11] However, our legislature has determined that such effects are outweighed by the benefit of established farms investing in the expansion of agricultural operations in Pennsylvania, in regulatory compliance with approved nutrient management plans. *See* Beidel, ***Pennsylvania's Right-to-Farm Law***, 110 Penn St. L. Rev. at 172 ("Given the benefits of nutrient management plans to the environment, this amendment is beneficial not only to farmers but also to the community. It was part of a far-reaching legislative plan to encourage the voluntary development of nutrient management plans and to decrease the deleterious effects of improperly handled manure on the environment.") (footnotes omitted). Such policy decisions are the province of the legislature.

Because the record reveals that, as a matter of law, all three prongs of the blueprint for protection from nuisance claims provided by subsection 954(a) have been established, Plaintiffs' claims are barred and the trial court properly granted Defendants' motions for summary judgment.

Orders affirmed.

---

[11] We do note that the spreading of LSM on the fields on the Will-O-Bett Farm is not a daily, or even regular, occurrence. Rather, the spreading occurs, on different fields of the farm, on approximately 8 to 12 days in the spring (April/May), and about half that many days in the fall (early November).

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 3/29/2018