J-E02002-21

2022 PA Super 61

| ERIC DOBRANSKY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EQT PRODUCTION COMPANY AND | : | No. 900 WDA 2019 |
| HALLIBURTON ENERGY SERVICES, | : | |
| INC. | : | |

Appeal from the Order Entered May 22, 2019
In the Court of Common Pleas of Greene County Civil Division at No(s):
AD 142-2014


BEFORE: PANELLA, P.J., BENDER, P.J.E., BOWES, J., LAZARUS, J., OLSON, J., DUBOW, J., KUNSELMAN, J., MURRAY, J., and McCAFFERY, J.

DISSENTING OPINION BY BOWES, J.:          **FILED: APRIL 11, 2022**

I respectfully dissent. Although I concur with the learned Majority's conclusion that the trial court erred in granting summary judgment in favor of EQT Production Company ("EQT") and Halliburton Energy Services, Inc. ("HESI") (collectively, "Appellees") pursuant to 77 P.S. § 461(1)(i) ("Section 302(a)(1)"), I would nonetheless find that Appellees were Eric Dobransky's statutory employers pursuant to 77 P.S. § 461(2) ("Section 302(a)(2)") and, consequently, entitled to tort immunity. Thus, I would affirm the trial court's order on that basis.

Summary judgment is "appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." ***Summers v.***

*Certainteed Corp*., 997 A.2d 1152, 1159 (Pa. 2010). Our scope and standard of review in this specific context is well-established:

> When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals.

*Id*. (cleaned up). Additionally, "[t]o the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record." *Id*.

Section 302(a)(2) is part of the Pennsylvania Workers Compensation Act ("the WCA"), under which employers are "liable for compensation for personal injury" that an employee sustains "in the course of his employment . . . without regard to negligence[.]" 77 P.S. § 431. In consideration of this mandated liability, the WCA immunizes employers from additional civil claims for damages. *See* 77 P.S. § 481(a) ("The liability of an employer under this act shall be exclusive and in place of any and all other liability . . . in any action at law or otherwise on account of any injury or death."). Our Supreme Court has described this trade-off in clear terms:

By virtue of the [WCA], an employee's common law right to damages for injuries suffered in the course of his employment as a result of his employer's negligence is completely surrendered in exchange for the exclusive statutory right of the employee to compensation for all such injuries, regardless of negligence, and the employer's liability as a tortfeasor under the law of negligence for injuries to his employee is abrogated.

*Kohler v. McCrory Stores*, 615 A.2d 27, 30 (Pa. 1992) (cleaned up). Thus, the WCA provides the exclusive remedy for an aggrieved employee. *Bigley v. Unity Auto Parts, Inc.*, 436 A.2d 1172, 1178 (Pa. 1981).

Section 302(a) pertains to the duties owed under the WCA by contractors with respect to the employees of its subcontractors, and it provides as follows:

A contractor who subcontracts all or any part of a contract and his insurer shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured its payment as provided for in this act. Any contractor or his insurer who shall become liable hereunder for such compensation may recover the amount thereof paid and any necessary expenses from the subcontractor primarily liable therefor.

For purposes of this subsection, a person who contracts with another (1) to have work performed consisting of (i) the removal, excavation or drilling of soil, rock or minerals, or (ii) the cutting or removal of timber from lands, or (2) to have work performed of a kind which is a regular or recurrent part of the business, occupation, profession or trade of such person shall be deemed a contractor, and such other person a subcontractor.

77 P.S. § 461. Thus, a contractor may be deemed the statutory employer of an employee of its subcontractor if this "specialized definition" is satisfied. *See Doman v. Atlas America, Inc.*, 150 A.3d 103, 106-08 (Pa.Super. 2016). If a contractor is deemed a statutory employer, the contractor is

secondarily liable for worker's compensation claims to the subcontractor's employees but immunizes such entity from tort liability in the same manner as a "direct employer." *Id.* at 107 (citing 77 P.S. § 52). Thus, Section 302(a) provides a liability backstop against direct employers who are unable to pay WCA compensation to their employees.

With these basic legal principles in mind, I briefly review the basic and undisputed facts of this case. On June 19, 2012, several corporate entities were involved in work to prepare a Marcellus shale drilling site in Greene County ("Scotts Run") for natural gas production. EQT owned the mineral rights on the property and contracted with HESI to assist its efforts pursuant to a Master Service Agreement ("MSA"). The MSA broadly provides for a wide range of potential responsibilities that could be delegated to HESI by EQT. Of particular note, HESI has a contractual obligation to "cause all materials and other parts of the Work to be readily available as and when required or needed for or in connection with the construction, furnishing and equipping of the Project or the Work." MSA at § 8.5. Indeed, the MSA defines the "Work" to include all "labor, materials, equipment and services" needed under the particular circumstances. *Id*. at § 1.1-1.2.

Although the specific scope of HESI's duties at Scotts Run is not evident from the contractual documents, it is well-established in the certified record. Bradley Maddox, who was EQT's drilling manager at the time of the accident, testified in a deposition HESI was providing "mud services" at all of EQT's well

sites, which included responsibility for the "inventory" of barite. **See** Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 21 at 16-19, 27; **see also** Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 19 at 44 (same). In HESI's interrogatory responses, it described itself as providing "barite and other bulk items such as sand and cement" at Scotts Run. Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 16 at ¶ 22.

While HESI took on the ultimate responsibility for ensuring a regular and steady supply of barite at Scotts Run, it elected to subcontract the transportation of the materials to the well site into the care of Northwest Concrete Products, Inc. d/b/a Northwest Logistics ("Northwest") under a separate agreement ("Transportation Agreement"). Pursuant to this contract, Northwest was engaged "to transport the goods or materials tendered to it" by HESI. Transportation Agreement at § 1.

The record confirms that Northwest was responsible for shipping and unloading, *inter alia*, barite on behalf of HESI at Scotts Run. Jeremy Johnson, operations manager for Northwest's dry bulk division in Greensburg, Pennsylvania at the time of Dobransky's accident, testified in a sworn deposition that Northwest regularly transported barite, cement, and sand in connection with HESI's work at such drilling operations. **See** Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 20 at 49; **see also** Appellees' Brief in Support of Summary Judgment, 9/17/18, at

Exhibit I at 34 ("My understanding is that [Northwest] provided transportation services for [HESI], transporting and unloading things like barite and sand that [HESI] would use as part of its business activities at the well site[.]"). Finally, a sales order form issued by HESI to EQT on June 20, 2012, confirms that Northwest was responsible for shipping barite purchased by HESI to the Scotts Run well site. *Id*. at Exhibit G at 1.

Of particular importance, the record also indicates that HESI was subcontracting a substantial amount of well site shipments to Northwest in 2012. As noted above, Mr. Maddox testified that he administered a program under which HESI was responsible for providing similar mud services at **all** of EQT's well sites. *See* Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 21 at 16-19. Mr. Johnson confirmed that HESI was Northwest's "primary customer" in 2012, accounting for at least "99 percent" of the company's business. Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 20 at 9. Furthermore, testimony from other Northwest personnel stated HESI's well site support business was so extensive that it had retained multiple transportation subcontractors like Northwest. *See* Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 14 at 15.

With these facts in mind, I turn to the merits of this case. As noted above, I agree with the Majority's apt analysis as to Section 302(a)(1). Accordingly, I need not discuss that section further. However, I note that it

is well-settled that this Court may affirm on an alternate basis in the context of summary judgment where that basis was raised by the moving party in the trial court, such that the non-moving party had an opportunity to respond. *Hassel v. Franzi*, 207 A.3d 939, 957 n.6 (Pa.Super. 2019); *see also*, *e.g.*, *Branton v. Nicholas Meat, LLC*, 159 A.3d 540, 562 n.21 (Pa.Super. 2017).

Turning to Section 302(a)(2), our Supreme Court has described the application of this statutory provision, as follows:

> [E]mploying the principle of liberal construction in furtherance of the Act's remedial purposes, . . . we find it to be plain enough that the Legislature meant to require persons (including entities) contracting with others to perform work which is a regular or recurrent part of their businesses to assure that the employees of those others are covered by workers' compensation insurance, on pain of assuming secondary liability for benefits payment upon a default.

*Six L's Packing Co v. W.C.A.B. (Williamson)*, 44 A.3d 1148, 1151 (Pa. 2012) ("*Six L's*").  Thus, coverage under Section 302(a)(2) is drawn broadly:

> [T]he statute extends to **any scenario** in which "a contractor . . . subcontracts all or any part of a contract," within the scope of the work delineated in Section 302(a)'s specialized definition of "contractor" (including work of a kind which is a 'regular or recurrent part of the business' of the putative statutory employer).

*Id*. (quoting 77 P.S. § 461) (emphasis added).

A survey of binding and persuasive precedent applying Section 302(a)(2) reveals it to be a factually intensive undertaking.  Of particular note, however, Pennsylvania courts confronting this issue in cases involving truck drivers have tended to conclude that Section 302(a)(2) applies and, thereby, renders the hiring entity both secondarily liable for WCA compensation and

immune from further tort litigation. *See Six L's*, *supra* at 1150-51 (concluding a company that "grows, harvests, processes, and distributes tomatoes" was the statutory employer of a subcontractor truck driver who suffered a vehicular accident while "transporting tomatoes between a warehouse . . . and a processing facility"); *Six L's Packing Co. v. W.C.A.B. (Williamson)*, 2 A.3d 1268, 1280-81 (Pa.Cmwlth. 2010), *affirmed*, 44 A.3d 1148 (Pa. 2012) ("*Williamson*") (same); *Cargill Meats v. W.C.A.B. (Heffner)*, 164 A.3d 651 (Pa.Cmwlth. 2016) (non-precedential memorandum at 5-6) (holding that a company who subcontracted transportation of a "finished meat product" was the statutory employer of an injured truck driver); *Garlick v. Trans Tech Logistics, Inc.*, 636 F. App'x 108, 112 (3d Cir. 2015) (finding company providing water deliveries to drilling sites was the statutory employer of a subcontractor's trucker killed during delivery because "[t]ransporting bulk liquids was a regular and recurrent part" of the company's business).[1]

Applying this case law to the instant circumstances, I reject the Majority's conclusion that HESI was not in the business of supplying and transporting barite. While there is no "purchase order" in the record as contemplated by § 2.1.1 of the MSA, I find the Majority's analysis places

---

[1] As the Majority notes in its writing, while these cases from the Commonwealth Court and the U.S. Court of Appeals for the Third Circuit are not binding upon this Court, we may rely upon them as persuasive authority. *See* Majority Opinion at 25 n.10.

outsized importance upon the absence of this document. ***See*** Majority Opinion at 26-27 ("Further, Appellees point us to no purchase order issued by EQT in the record . . . . Thus, we cannot agree with Appellees that the MSA and the sales order form indisputably establish that HESI was in the business of supplying and transporting barite.") As noted above, our Supreme Court has observed that we must "review the grant of summary judgment in the context of the **entire** record." ***Summers***, ***supra*** at 1159 (emphasis added). The contractual documents referenced by the Majority are merely silent on the issue of the scope of HESI's specific duties at Scotts Run, as opposed to contradictory. Yet, there is sufficient documentary evidence to confirm the existence of contractual relationships amongst the parties at the time of the underlying incident in this case. To my mind, whatever silence remains is sufficiently dispelled by the testimony and discovery responses noted above.

Indeed, despite the absence of these documents, the Majority seems to have no difficulty in specifically characterizing HESI's duties at Scotts Run as follows: "[T]he evidence establishes, at most, that HESI needed barite for making the drilling mud and that it had Northwest transport and deliver barite to it at the well site." Majority Opinion at 28. Having narrowly construed HESI's duties, the Majority concludes that "the fact that an entity contracts with a subcontractor to have materials delivered to it in order to conduct its business or trade does not mean that a part of that entity's business or trade

is the transporting and/or shipping of those materials from one place to another." *Id*. at 28.  I cannot join this analysis.

To briefly summarize the relevant facts, all parties agree that the contractual relationships amongst EQT, HESI, and Northwest were in force on the date of this incident.  The certified record clearly indicates that at Scotts Run HESI was responsible for "mud services" which included, *inter alia*, maintaining an inventory of barite.  HESI was under a contractual obligation to ensure that barite was "readily available as and when required or needed for or in connection with the construction, furnishing and equipping of the Project or the Work."  MSA at § 8.5.  Rather than assume direct responsibility for the necessity of transporting barite to Scotts Run, HESI "tendered" these materials to Northwest pursuant to the Transportation Agreement.  These deliveries of barite by Northwest were not isolated or infrequent.  To the contrary, the record shows that HESI accounted for virtually all of Northwest's business in 2012.  This information also underscores the breadth of HESI's business of supporting EQT's development of natural gas wells by providing barite, which required the assistance of multiple transportation subcontractors in addition to Northwest.  With these facts in mind, it seems beyond cavil HESI's "business" encompassed these activities.[2]

_____

[2]  The second requirement of Section 302(a)(2) mandates that the business activity must also be a "regular or recurrent" undertaking.  **See** 77 P.S. § 461.  The Majority has not discussed this factor.  Briefly, I note that the evidence

These circumstances do not implicate the unrelated and delivery drivers referenced in the Majority's writing. The delivery of materials in this case was not merely incidental to HESI's contractual obligations but was one of its explicit duties, *i.e.*, ensuring access to and inventory of barite. Rather, the record indicates Northwest was essentially operating **as** HESI's transportation and distribution network in June 2012, with these activities accounting for at least ninety-nine percent of Northwest's business that year. Indeed, HESI made use of multiple such transportation subcontractors as part of its well support business. Accordingly, the transportation and delivery of barite by Northwest was a critical and extensive part of HESI's well support business at the time of the accident. Dobransky's own testimony confirms as much. **See** Dobransky's Omnibus Brief in Opposition to Summary Judgment, 8/1/18, at Exhibit 1 at 52, 101 ("[A] lot of times when they needed barite, they needed it, like, now. Like, when they called you for barite, it was almost ASAP.").[3]

---

detailed throughout this writing readily establishes the frequency of the barite deliveries directed by HESI and carried out by Northwest.

[3] Under these facts, the parade of horribles raised by the Majority lacks teeth. **See** Majority Opinion at 28 n.14, 29 n.16. If a delivery company's entire operation consisted of providing transportation and delivery services on behalf of a single entity, *e.g.*, the same chain of grocery stores or bakeries, it may make sense to construe the drivers as statutory employees of the contracting company pursuant to Section 302(a)(2). Moreover, if a mining operation's only task was to provide barite to a single company, its miners might fairly be considered statutory employees under the same. I speak conditionally here only because, ideally, this Court should not traffic in hypotheticals based on facts not squarely before us. **See Phila. Entertainment and Dev. Partners, L.P. v. City of Philadelphia**, 937 A.2d 385, 392 (Pa. 2007).

- 11 -

I also find the Commonwealth Court's holding in ***Zwick v. W.C.A.B.***, 106 A.3d 251 (Pa.Cmwlth. 2014) instructive on this issue. In that case, Marco Popchocoj ("the claimant") was a subcontractor who was injured while performing construction and rehabilitation work at a property for a licensed realtor named Mark Zwick. Zwick was determined to be the claimant's statutory employer under Section 302(a)(2). On appeal, Zwick argued that the dissimilarity between his and the claimant's respective occupations should preclude the application of Section 302(a)(2). The Commonwealth Court disagreed, and offered the following rationale:

> Zwick asserts that Section 302(a) is inapplicable because he is a licensed realtor, so the work the claimant performed at the time of his injury was not a regular part of Zwick's business. The record belies this claim. Zwick testified that construction rehabilitation work was a part of his business. Zwick further testified that he hired [the claimant's employer] to do construction work at the [p]roperty to prepare it for resale and that Zwick was 'essentially' the general contractor on the job. Zwick also testified that [the claimant's employer] had previously done construction work for him at another property. . . . The credited evidence supports the WCAB's conclusion that Zwick was in the business of rehabilitating properties for resale and that he hired [the claimant's employer] to perform work that was a regular part of his business. Therefore, Zwick met the definition of a "contractor" under Section 302(a) of the Act.

***Zwick***, ***supra*** at 255. Since Zwick regularly solicited construction rehabilitation work from the claimant and other parties, the Commonwealth Court found that Zwick met the definition for a statutory employer under Section 302(a)(2) even though he was not directly engaged in carrying out construction work himself. ***Id***. at 255 ("'[S]ection 302(a), on its terms, also

- 12 -

pertains to contractual delegations of aspects of an employer's regular or recurrent business activities.'" (quoting **Six L's**, **supra** at 1158)).

Applying **Zwick** to the instant circumstances, it matters not at all that HESI was not directly involved in transporting and delivering barite. By its very nature, subcontracting involves a delegation of responsibility to another party. HESI took on a responsibility to, *inter alia*, ensure the availability and inventory of barite at EQT well sites, including Scotts Run. HESI relied upon Northwest to fulfill that obligation by effectuating deliveries of the material to the sites. The record uniformly reflects the frequency and volume of barite deliveries required pursuant to HESI's well support business with EQT and Northwest, which monopolized Northwest's business activities in 2012.

On this point, I find that the Majority has taken a too-monolithic view of business activities that risks creating an unnecessary bright-line rule concerning the coverage of transportation contractors under the WCA. Where part of an entity's business activities includes some regular or recurrent activity relying upon the assistance of subcontractors, Section 302(a)(2) applies.[4] Furthermore, the party contesting that his injuries are "not work-

_____

[4] The learned Majority has quoted opinions from both this Court and our Supreme Court expressing concern with the application of Section 302(a)(2) and discussing the alleged rarity of secondary liability under the WCA. **See Patton v. Worthington Associates, Inc.**, 89 A.3d 643, 652 (Pa. 2014) (Baer, J., concurring); **Doman v. Atlas America, Inc.**, 150 A.3d 103, 110 (Pa.Super. 2016). I do not find this issue as clearcut as the Majority, which seems focused on the potential evils worked by the litigation immunity

related" under the WCA bears the burden of rebutting the presumption that he is covered. **Kohler v. McCrory Stores**, 615 A.2d 27, 32 (Pa. 1992). Here, "it is the plaintiff who asserts he is not covered by the [WCA] and he must allege facts to show that he is not." **Id**. at 32 n.5 (cleaned up).

Although this Court must view the record in the light most favorable to Dobransky as the non-moving party, he has a concomitant obligation under Pennsylvania law to adduce evidence in support of his position, *i.e.*, that Appellees are not his statutory employers. **See Finder v. Crawford**, 167 A.3d 40, 44 (Pa.Super. 2017) ("Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof establishes the entitlement of the moving party to judgment

---

afforded to statutory employers by Section 302(a)(2). Concomitantly, this statute also makes statutory employers potentially liable without regard for negligence. Thus, "[t]he tort immunity associated with the imposition of secondary liability 'reflects the historical *quid pro quo* between an employer and employee whereby the employer assumes liability without fault for a work-related injury[.]'" **Doman**, **supra** at 110 (quoting **Tooey v. AK Steel Corp.**, 81 A.3d 851, 860 (Pa. 2013)). While the WCA requires employers to provide workers' compensation coverage to their employees, this mandate does not dispel the possibility that a direct employer will be unable to pay when the time comes. **See Six L's**, **supra** at 1150 ("[I]t was determined during the course of the ensuing litigation that [the truck driver's direct employer] did not maintain workers' compensation insurance.").

Furthermore, I note that the concerns raised in both **Patton** and **Doman** acknowledged that this Court is bound to apply the WCA as currently drafted by the General Assembly. **See Patton**, **supra** at 651 ("I would advocate to the General Assembly that it revise the statutory employer doctrine[.]"); **Doman**, **supra** at 109 ("[W]e note that there have been prior calls to the legislature to reconsider Pennsylvania's statutory scheme."). Since those holdings, no legislation has been adopted amending Section 302(a)(2).

as a matter of law."). Instantly, Dobransky has produced no affirmative evidence or testimony to dispute the basic facts set forth above concerning the applicability of Section 302(a)(2). Since he bears the burden of proof on this specific aspect of the case, HESI is entitled to summary judgment as a matter of law based upon the undisputed facts of record. Thus, I would affirm the trial court's grant of summary judgment in favor of HESI.

Although this issue is understandably absent from the Majority's writing, I will also briefly address whether EQT should also be considered Dobransky's statutory employer due to "vertical privity." This Court has concluded that "no statutory employee status exists where no vertical contractual privity exists." **Emery v. Leavesly McCollum**, 725 A.2d 807, 811 (Pa.Super. 1999) (*en banc*) (holding that statutory employer immunity extends to all contractors and subcontractors in vertical contractual privity). However, "an immediate contractual relationship is **not** required for statutory employer immunity." **Id**. (emphasis added). Rather, "the determining factor in these cases is whether or not there is a vertical 'chain' of contracts," wherein "all of the contracts proceed downwards from the owner, *i.e.*, owner contracts with general contractor, general contract contracts with subcontractor, subcontractor contracts with sub-subcontractor, and so on." **Id**. at 812.

Here, EQT functioned as both the owner and the general contractor at Scotts Run with the overall intent of preparing the site for natural gas production. As detailed above, EQT contracted with HESI. In turn, HESI

subcontracted a portion of its duties under that agreement to Northwest. Thus, vertical contractual privity is present in this case. Accordingly, EQT is similarly entitled to statutory employer immunity under Section 302(a)(2). ***See Emery***, ***supra*** at 811-12 (holding that a "subcontractor is [the] statutory employer of [a] sub-subcontractor's employee because of vertical relationship between general contractor, subcontractor and sub-subcontractor."). Thus, I would also affirm the trial court's grant of summary judgment in favor of EQT.

Based on the foregoing, I respectfully dissent.

Judge Olson, Judge Dubow, and Judge Murray join this Dissenting Opinion.